# United States Court of Appeals
## FOR THE EIGHTH CIRCUIT

_____

No. 10-2857
_____

United States of America,          *
                                          *

        Appellee,          *

                                          *

      v.                  *

                                          *

Brian Keith Ellefsen,       *

                                          *

        Appellant.       *

_____

No. 10-2858              Appeals from the United States
_____              District Court for the
                               Western District of Missouri.

United States of America,          *

                                          *

        Appellee,          *

                                          *

      v.                  *

                                          *

Mark Edward Ellefsen,      *

                                          *

        Appellant.       *

_____

Submitted: April 11, 2011
Filed:   September 9, 2011

_____

Before WOLLMAN and MELLOY, Circuit Judges, and MILLER,[1] District Judge.
_____

WOLLMAN, Circuit Judge.

Brian Keith Ellefsen and Mark Edward Ellefsen were convicted of conspiracy to defraud the United States, in violation of 18 U.S.C. § 371, by obstructing the Internal Revenue Service (IRS) in the assessment and collection of federal taxes.[2] Brian was also convicted of three counts of filing false income tax returns, in violation of 26 U.S.C. § 7206(1), while Mark was convicted of three counts of aiding and assisting the preparation of false income tax returns, in violation of § 7206(2). The district court[3] sentenced Brian to 22 months' imprisonment and ordered restitution in the amount of $1,202,475.58. Mark was sentenced to 14 months' imprisonment and ordered to pay $50,000 in restitution. The Ellefsens appeal their convictions, arguing that the government intentionally suppressed evidence that was material and favorable to the defense, in violation of Brady v. Maryland, 373 U.S. 83 (1963). They further contend that the district court abused its discretion in admitting certain testimony, in limiting their cross-examination of an IRS agent, and in excluding the testimony of a defense-expert witness. They also appeal from the denial of their motions for judgment of acquittal or a new trial, arguing that the government failed to prove that the their conduct was willful. Finally, the Ellefsens challenge the restitution order. We affirm.

_____

[1]The Honorable Brian S. Miller, United States District Judge for the Eastern District of Arkansas, sitting by designation.

[2]Because the parties share a last name, we will refer to them individually by their first names for clarity.

[3]The Honorable David Gregory Kays, United States District Judge for the Western District of Missouri.

## I. Background

Brian is an orthopedic surgeon, who provided services through a corporation named Southwest Missouri Bone & Joint, Inc. (SMBJ, Inc.). In 1997, Brian hired his brother Mark to serve as SMBJ, Inc.'s business manager. L. Michael Stelmacki is a certified public accountant who had assisted Brian with his accounting and taxes since Brian first began practicing medicine in the late 1980s.

In 1997, the Ellefsens attended a presentation by James Quay about the Aegis Business Trust System, which used domestic and foreign trusts to shelter assets from taxes. Quay explained that the Aegis system was "an asset protection device with tax deferral," through which professionals could send their income offshore and defer paying taxes on it until they "[r]epatriate[d] the funds back to the United States." Tr. at 1121. Participants in the system could access the funds with a credit card. Following the presentation, the Ellefsens sought advice from Stelmacki, who thereafter spoke to Quay about the Aegis system. Stelmacki concluded that Quay "was a person to avoid" and urged Brian to consult an independent tax attorney—one not associated with Aegis. Tr. at 151. Brian failed do so. In July 1997, the Ellefsens enrolled in the Aegis system.

On July 21, 1997, Stelmacki faxed an article to Mark, with a note that read, "Mark, please read this article. I hope that it's not too late for Brian to reconsider." The article addressed the IRS's crackdown on abusive trust schemes. Stelmacki wrote to Brian on August 26, 1997, saying:

> I noticed in your July disbursements an expense to Mr. Jim Quay for $15,000 for professional fees. I am also aware that you have decided to go ahead with the Aegis Company's program to use offshore entities to shield you from Federal and State income taxes. I am writing to you because I am concerned for you and the risks you may inadvertently be taking. . . . While I share your interest in reducing your tax burden, I feel

-3-

that you have the opportunity to build sizable wealth without incurring high risks.

. . .

It seems to me that the promoters are relying on an elaborate chain of complex entities to conceal taxable income. They have concocted a series of transactions to cloak earned taxable income from rendering patient services in Carthage, Missouri into non-reported foreign source income and then arranging to lend or gift the money back to you. I am especially suspicious when I learned that they will provide you with a Visa card to access the money. They have also represented that you will have a power of attorney that will allow you to transfer funds at will. You will be earning the income by performing services and you will be enjoying the benefits of the income. Therefore it is reasonable that the I.R.S. could potentially look through this masquerade and say that it is taxable income to you regardless of the structure.

. . .

I am asking that you consider the worst case scenario in which the I.R.S. takes the position that you are committing tax evasion. They have the power to assess huge penalties and interest, to prosecute you, to ruin your career, and seize your property. Is the risk worth it?

Shortly thereafter, Stelmacki spoke to Mark regarding the letter and his concerns. Following their conversation, Stelmacki believed that the Ellefsens would not proceed with Aegis, and thereafter the Ellefsens did not mention Aegis to Stelmacki.

In August 1997, Brian established the Stekadash Asset Management Trust (SAMT) and the Southwest Missouri Bone & Joint Trust (SMBJ Trust) and opened bank accounts in their names. In September, he authorized Aegis to open foreign bank accounts for him. Thereafter, three bank accounts were opened in St. John's, Antigua. One account was in the name Stekadash International Trust, and two were

in the name of Stekadash Services Company Ltd. In early October, cashier's checks drawn from SAMT's bank account were deposited into the Stekadash International Trust account.

After the foreign bank accounts were established, Brian received a credit card, which he could use for cash advances and purchases. Aegis explained that the foreign bank had been instructed to transfer funds from the Stekadash International Trust account to the Stekadash Services Company Ltd. account that was used to pay the credit card balance. The third account maintained a $15,000 balance to secure the credit card. Brian could transfer funds from the domestic accounts into the Stekadash International Trust account and ultimately use those funds to pay the monthly balance on the credit card without ever paying taxes on the income.

The Ellefsens also met with Lynn Bell-Osina, an accountant then-associated with Aegis, and hired her to prepare tax returns for the newly created entities. After the initial meeting, Bell-Osina had no further interactions with Brian. Mark provided the records to prepare the tax returns.

In 1997, SMBJ, Inc. transferred $107,388 through the Aegis system and recorded the transfers as management fees in its records and on its 1997 corporate tax return. In 1998, SMBJ, Inc. transferred $199,000 through the Aegis system, again recording the transfers as management fees in its records and on its 1998 corporate tax return. In 1999, SMBJ, Inc. transferred $175,000 through the same process. On his personal tax returns in 1997 through 1999, Brian declared that he had no interest or authority over any foreign accounts. From 1997 to 1999, Brian used his credit card mostly for cash advances, but also to purchase lobsters, jewelry, wine, and high-end apparel, among other things.

On March 31, 2000, federal agents executed search warrants at the Aegis offices and Bell-Osina's office. Bell-Osina testified that in mid-April 2000, she called

Mark and told him that "the Internal Revenue Service had come to my office and seized the files of my clients, that I had subsequently contacted . . . a tax attorney, who explained to me that . . . the Aegis system was illegal." Tr. at 563. Bell-Osina explained that she was "calling all of my clients to let them know that they needed to seek alternate tax counsel, that they should go to see a tax attorney." Id. Bell-Osina recommended the attorney who had advised her that her clients should amend their tax returns to undo the trust. During their conversation, Mark told Bell-Osina that he was not going to amend the returns.

In July 2000, Aegis mailed a newsletter to its members, detailing a plan to "Drop[] Off the Radar Screen," by using a new program called the Fortress Trust. In December 2000, Brian converted to the new system, establishing Strategic Management Services, LLC (SMS, LLC). Mark, as its registered agent, opened two bank accounts in the name of SMS, LLC in February 2001 at a domestic bank. Brian transferred $300,000 from the SAMT account to an SMS, LLC account.

In 2000, SMBJ, Inc. transferred $650,000 to the Aegis-created entities and deducted the transfers as management fees on its 2000 corporate tax return. On his personal tax returns, Brian again declared that he had no interest or authority over any foreign accounts. As Stelmacki was preparing SMBJ, Inc.'s corporate tax return, he expressed concern regarding the deduction of $650,000 in management fees and requested that Brian represent in writing that the fees were legitimate. Stelmacki testified that he sent a representation letter because he wanted to be certain that Brian actually acknowledged that the payment was "an ordinary and necessary expense of business." Tr. at 199. Stelmacki discussed the representation letter and his concerns over the fees with Mark, and Brian thereafter signed and returned the letter.

In 2001, SMBJ, Inc. recorded an additional $460,000 in management fees. In February 2002, while preparing the 2001 corporate tax return for SMBJ, Inc. Stelmacki sent another letter to Brian, in which he stated:

Again we noted that Southwest Missouri Bone & Joint, Inc. incurred substantial management fees amounting to $460,000. Last year, we asked that you provide us with a representation letter as to the deductibility of those management fees which you provided to us. We are concerned that these expenses will not meet the I.R.S. test as to being ordinary and necessary expenses of the business. It is our understanding that your financial consultants have attorneys and tax specialists that have advised you that these expenses are properly deductible. However, the I.R.S. says that tax preparers should suspect that a taxpayer may be involved in a tax shelter that the I.R.S. considers abusive if certain factors exist.

. . .

We believe this important matter should command your immediate attention. Regarding the Corporation's 2001 tax returns, we are unable to proceed in completing the tax returns unless we have an opinion from a tax attorney who is not associated with promoting or administering the management company or related entities indicating that he has reviewed the transactions and concluded they are legitimate and deductible. We will also require a representation letter from you similar to last year.

Stelmacki enclosed numerous articles regarding abusive trust schemes and the possible criminal ramifications. In a phone conversation that September, Mark informed Stelmacki that they had hired someone else to prepare their 2001 return and that Brian would not provide further information or seek an outside opinion. SMBJ, Inc.'s 2001 corporate tax return was ultimately prepared by an accountant associated with Aegis and deducted $460,000 in management fees.

In February 2003, Stelmacki sent an IRS press release by facsimile to the Ellefsens. The release listed the "dirty dozen tax scams." The first scam listed was entitled OFFSHORE TRANSACTIONS: "Some people use offshore transactions to avoid paying United States income tax. Use of an offshore credit card, trust or other

arrangement to hide or underreport income or to claim false deductions on a federal tax return is illegal." The release mentioned that the IRS was "offering people with improper offshore financial arrangements a chance to make things right." Through April 15, 2003, eligible taxpayers would not face civil fraud and information return penalties. The release warned that a taxpayer "who does not come forward now, however, will be subject to payment of taxes, interest, penalties and potential criminal prosecution."

In April 2003, SMBJ, Inc. reported $180,000 in management fees on its 2002 corporate tax return. Those funds were deposited in an SMS, LLC bank account, from which Mark wrote checks to pay Brian's personal expenses, including almost $270,000 for the construction of Brian's new home and the purchase of a lake house.

In March 2005, Stelmacki received a federal grand jury subpoena from an IRS agent for records pertaining to Brian and SMBJ, Inc. When Stelmacki informed Brian that he was under investigation, Brian responded that "he had nothing to hide." Tr. at 269. In July 2005, Brian retained William Hauser to review Brian's prior individual and corporate tax filings. Following that review, in December 2005 Hauser filed amended individual tax returns for Brian, adding most of the so-called management fees to his taxable income. In February 2006, Brian remitted $534,675 in additional payment to the IRS. According to Hauser, that amount represented all taxes, penalties, and interest. The SMBJ, Inc. returns from 1997 to 2002, however, were not amended.

Brian and Mark were indicted in April 2007 and pleaded not guilty. The conspiracy count alleged that from 1997 through 2003, the Ellefsens conspired to divert more than $1.5 million in funds from SMBJ, Inc. "for the benefit, use and enjoyment of Defendant B. Ellefsen, without paying any taxes on the diverted funds." The remaining charges alleged that Brian made and subscribed false individual income tax returns for the calendar years 2000, 2001, and 2002, and that Mark aided and assisted in the preparation of those false and fraudulent returns.

-8-

The case proceeded to trial in May 2009. The government called IRS revenue agent Sharon Vandenberg to testify as a summary witness. According to Vandenberg, SMBJ, Inc. was a schedule C corporation and "a personal service corporation, because the income generated off of this corporation is directly from [Brian's] personal services." Tr. at 968. Vandenberg testified that SMBJ, Inc. paid so-called management fees to SMBJ Trust, which in turn transferred the funds to SAMT. Although SMBJ Trust received the management fees, "there [were] no expenses, no services provided. It merely transfers the income at—before paying taxes on it down to Stekadash Asset Management Trust." Id. at 931. From there, SAMT transferred the funds to an offshore trust, Stekadash International Trust, without paying taxes. The funds were then transferred to Stekadash Services Company, Ltd., another offshore account, and used to pay for Brian's personal expenses. Vandenberg explained that in 2001, the structure had changed: SMBJ, Inc. began paying the management fees to SMS, LLC, which paid wages to Mark and the personal expenses of Brian.

To determine SMBJ, Inc.'s tax liability, Vandenberg "collaps[ed] the trust," adjusting the corporation's income to "move the items back to where they would have been if those trusts had not been in existence." Tr. at 968. Because SMBJ, Inc. had treated the management fees as a deduction, she added that amount back into the corporation's income. The income was then treated as a constructive dividend to Brian, resulting in tax consequences for both the corporation and Brian, as set forth in the summary charts Vandenberg had prepared. On direct examination, Vandenberg did not mention Brian's amended individual tax returns and additional payments, wherein he had reported the management fee as income and paid income taxes on those amounts. When defense counsel attempted to cross-examine Vandenberg about the amended returns, the district court sustained the government's objection that those returns were beyond the scope of direct examination. Vandenberg testified that the total tax loss was $1.1 million.

The defense called Hauser to testify regarding Brian's amended individual tax returns. Hauser testified that he found a problem with the amount of management fees deducted on the SMBJ, Inc. corporate tax returns. He testified that the corporate tax returns for SMBJ, Inc. were correct but that he had amended Brian's individual tax returns to reflect the additional income he had failed to report. According to Hauser, the amended returns included payment for all taxes due and owing, including penalties and interest.

The defense sought to introduce the expert testimony of Victoria Osborn, a certified fraud examiner. She was prepared to testify that, based on certain codes in the IRS documents, the IRS had accepted and posted the amended tax returns, meaning that civil liability had been determined. According to Osborn, the IRS had determined that Brian had paid his individual income taxes in full when he filed his amended tax returns. The district court sustained the government's objection to Osborn's testimony, remarking that "it is questionable whether or not this has any relevance in this case . . . if it does, this evidence should be excluded because any probative value it may offer is substantially outweighed by confusion of the issues, possible misleading of the jury, waste of time." Tr. at 1403.

Following the eleven-day trial, the jury found the Ellefsens guilty on all counts. Thereafter, the Ellefsens moved for judgment of acquittal or for a new trial, arguing, among other things, that the government withheld material, exculpatory information from discovery and that the evidence was insufficient to sustain their convictions. The district court determined that although the government did not provide the documents to the Ellefsens before trial the documents did not contain any new evidence, nor was the information contained therein material or exculpatory. D. Ct. Order of Jan. 11, 2010, at 11-12. The district court denied the Ellefsens' post-trial motions.

## II. Analysis

### A. Alleged <u>Brady</u> Violation

The Ellefsens contend that the government withheld various internal IRS documents related to Brian's amended individual tax returns in violation of <u>Brady v. Maryland</u>, 373 U.S. 83 (1963).  They argue that the documents showed that the IRS had accepted the amended returns in 2006, had treated the earnings as regular income (not dividends), and had deemed the amended returns a final civil assessment. According to the Ellefsens, "[t]he evidence would have negated any showing of willfulness on the part of the Defendants, contradicted any claim of fraud, and would have destroyed the government's dividend theory."  Appellants' Br. at 1.  We review for abuse of discretion the district court's denial of a new trial based on undisclosed <u>Brady</u> material.  <u>United States v. Ladoucer</u>, 573 F.3d 628, 636 (8th Cir. 2009).

"The Due Process Clause of the Fifth Amendment requires the government to disclose to the accused favorable evidence that is material to guilt or punishment and not otherwise available to the defendant."  <u>United States v. Santisteban</u>, 501 F.3d 873, 877 (8th Cir. 2007) (citing <u>United States v. Bagley</u>, 473 U.S. 667, 678 (1985); <u>Brady</u>, 373 U.S. at 87)).  To prove a violation of his right to due process, the defendant must show that the evidence was favorable and material and that the government suppressed the evidence.  <u>Id.</u>

Assuming that the evidence was favorable, the Ellefsens have failed to show that the undisclosed documents contained material information.  "[E]vidence is material only if there is a reasonable probability that, had the evidence been disclosed to the defense, the result of the proceeding would have been different."  <u>Ladoucer</u>, 573 F.3d at 636 (quoting <u>Pennsylvania v. Ritchie</u>, 480 U.S. 39, 57 (1987)).  A "reasonable probability" is "a probability sufficient to undermine confidence in the outcome." <u>Bagley</u>, 473 U.S. at 682.

Evidence regarding the IRS's treatment of the December 2005 amended returns does not undermine the finding that Brian and Mark acted willfully when Brian subscribed and Mark assisted in the preparation of false individual tax returns for 2000 through 2002. As an initial matter, we note that the amended returns were submitted years after the false returns had been filed and months after Stelmacki warned the Ellefsens that their records had been subpoenaed. We have previously said that "there is no doubt that self-serving exculpatory acts performed substantially after a defendant's wrongdoing is discovered are of minimal probative value as to his state of mind at the time of the alleged crime." United States v. Radtke, 415 F.3d 826, 840-41 (8th Cir. 2005) (holding that the district court did not abuse its discretion in excluding evidence that the defendant filed an amended tax return after he had been indicted for willfully subscribing to a known false tax return). The information set forth in the undisclosed documents was even less probative of the Ellefsens' state of mind: The jury was well aware that Brian had filed amended returns and had paid additional taxes and penalties; the undisclosed documents explained that the IRS processed those amended returns and additional payments. The IRS's treatment of the amended tax returns was at best marginally relevant to Brian's willfulness in making and subscribing the original returns and to Mark's willfulness in aiding and assisting in the preparation of fraudulent or false returns. Likewise, the documents did not contradict the charge of conspiracy to defraud the United States.

The Ellefsens contend that the undisclosed documents showed that the IRS treated the unreported income as Brian's earned income. Accordingly, they argue that the government's later characterization of the income as a constructive dividend showed "the existence of a dispute over the tax treatment *within the IRS* that negated a finding of willfulness by the Defendants." Appellants' Br. at 14. This is not a case in which "the taxability of unreported income is problematical as a matter of law" such that "the unresolved nature of the law is relevant to show that defendant may not have been aware of a tax liability or may have simply made an error in judgment." See United States v. Garber, 607 F.2d 92, 98 (5th Cir. 1978) (concluding that the taxability of earnings from the sale of blood plasma "was completely novel and

unsettled by any clearly relevant precedent"). Whether taxable as compensation or as dividends, it is undisputed that the income was subject to federal income tax and thus should have been reported to the IRS.

Because the undisclosed information was not material, we conclude that no Brady violation occurred. We note that the district court conducted a thorough review of the undisclosed document and prepared an opinion rejecting the allegations that the government had suppressed information. The district court also found baseless the Ellefsens' allegations of prosecutorial misconduct:

> I want to clear up something else. There were some allegations made about—against the government's attorneys and their conduct. And I want to make sure the record is clear that I found their conduct very honorable, very appropriate. . . . And I appreciate the professionalism during the course of this. In case there's any questions about that, because sometimes there [were] some things thrown . . . against the refrigerator and . . . I want to make sure that doesn't stick. Because there was nothing to that, in my opinion.

Sentencing Tr. at 91.

## B. Vandenberg's Testimony

The Ellefsens contend that because Vandenberg's classification of the management fees as constructive dividends was incorrect as a matter of law, the district court abused its discretion in admitting her testimony on that matter. According to the Ellefsens, "[p]ayments made to Dr. Ellefsen by SMBJ were Dr. Ellefsen's earned wages—not constructive dividends—and, therefore, properly deductible to the corporation." Appellants' Br. 21.

-13-

SMBJ, Inc. was a personal services corporation organized under subchapter C of the Internal Revenue Code. Corporations may deduct all ordinary and necessary expenses, including "a reasonable allowance for salaries or other compensation for personal services actually rendered." 26 U.S.C. § 162(a)(1). Dividends, however, are distributions of property made by the corporation to its shareholders out of its earnings and profits. § 316(a). Because corporations are not allowed a deduction for dividends paid to the shareholders, dividends are taxed as corporate income. See § 61; see also Menard, Inc. v. Comm'r, 560 F.3d 620, 621-22 (7th Cir. 2009) (explaining that a dividend is not deductible from the corporation's taxable income). A constructive dividend "means simply a corporate disbursement that is a dividend in the contemplation of law though not called such by the corporation making the disbursement." United States v. Mews, 923 F.2d 67, 68 (7th Cir. 1991). The Ellefsens contend that "the diverted income paid by SMBJ to the various Aegis trusts in the form of management fees should have been treated by the government as earned income to Dr. Ellefsen." Appellants' Br. 26.

We conclude that the district court did not abuse its discretion in allowing Vandenberg to testify that the funds flowing through the Aegis system constituted constructive dividends. "[W]here controlling shareholders divert corporate income to themselves, such diverted funds should be treated as constructive dividends." Simon v. Comm'r, 248 F.2d 869, 873 (8th Cir. 1957); see Truesdell v. Comm'r, 89 T.C. 1280, 1300 (1987) ("In concluding our discussion of the constructive dividend issue, we would emphasize that in a case such as this diverted amounts taxed to a shareholder as constructive dividends also remain fully taxable to the corporation to which attributable."). SMBJ, Inc. paid Brian a salary for his personal services, presumably the salary that he, as sole shareholder, demanded. Although the corporation likely could have paid him more for those services and properly deducted that amount as a business expense—with Brian then paying income tax on his additional compensation—the Ellefsens did not structure Brian's income in that way. They instead decided to utilize the Aegis system and falsely deduct management fees from SMBJ, Inc.'s corporate tax returns. The income was not taxed at all—despite

-14-

the fact that Brian was spending the money—until after the government subpoenaed documents from Stelmacki and Brian decided to amend his personal tax returns. In these circumstances, we conclude that the so-called management fees were properly considered constructive dividends.

The Ellefsens also allege a violation of their right to confront Vandenberg, arguing that they should have been allowed to question her about Brian's amended tax returns and the payments he made in 2006. At trial, defense counsel argued that he was trying to establish that "there's a difference of opinion about how these matters are handled. Because in the civil side, in these investments, these matters are handled as further earned income to my client." Tr. at 1021. The district court determined that the amended returns were beyond the scope of the direct examination and thus prohibited examination on the amended returns, but told counsel, "You can ask her what she used to make her calculations." Tr. at 1022. The Ellefsens argue that the cross-examination was prejudicially curtailed and that they were unable to test the tax-loss amount.

As stated above, Vandenberg testified as a summary witness. "[T]estimony by an IRS agent that allows the witness to apply the basic assumptions and principles of tax accounting to particular facts is appropriate in a tax evasion case." United States v. McElroy, 587 F.3d 73, 82 (1st Cir. 2009). "The testimony of a summary witness may be received so long as she bases her summary on evidence received in the case and is available for cross-examination." United States v. King, 616 F.2d 1034, 1041 (8th Cir. 1980).

Cross-examination into the basis of Vandenberg's testimony should have been allowed. See Fed. R. Evid. 611(c) ("Cross-examination should be limited to the subject matter of the direct examination and matters affecting the credibility of the witness."). That is, defense counsel should have been allowed to ask whether Vandenberg considered or relied upon the amended tax returns and her reasons for doing so or not doing so. Those questions would have been within the subject matter

of the direct examination, during which she explained how she completed her calculations and mentioned that "there's never anything absolute and firm in the tax law. It's—positions can be taken, discussed, weighed and merited." Tr. at 1010-11. Similarly, the Ellefsens should have been permitted to question Vandenberg about Brian's additional payments. Although the government now argues that the amount of tax loss is irrelevant, the government itself solicited the tax-loss amount during Vandenberg's direct examination. Accordingly, the defense should have been allowed to cross-examine Vandenberg regarding the $1.1 million tax-loss calculation and whether she considered Brian's additional payments.

We conclude, however, that any error in denying the cross-examination was harmless beyond a reasonable doubt. See Santisteban, 501 F.3d at 879 (standard of review). "To determine whether a Confrontation Clause error was harmless, we look to 'whether, assuming that the damaging potential of the cross-examination were fully realized, a reviewing court might nonetheless say that the error was harmless beyond a reasonable doubt.'" Id. (quoting Delaware v. Van Arsdall, 475 U.S. 673, 684 (1986)). Other than disallowing an inquiry into the treatment of the amended returns and additional payments, the district court permitted a comprehensive cross-examination of Vandenberg. Defense counsel inquired about her treatment of the management fees as dividends. Hauser, who prepared the amended returns, rebutted Vandenberg's calculations by testifying that the amended individual tax returns properly characterized the management fees as income to Brian. Moreover, the evidence against the Ellefsens was overwhelming. We thus conclude that any error in precluding them from cross-examining Vandenberg regarding the amended returns and additional payment does not require reversal.

## C. Exclusion of Osborn's Proposed Expert Testimony

The Ellefsens contend that the district court abused its discretion by excluding Osborn's testimony under Federal Rule of Evidence 403. The Ellefsens maintain that Osborn's testimony was relevant to prove their offense conduct was not willful and that it rebutted the testimony that the income should be treated as a dividend. Rule 403 provides that even relevant evidence "may be excluded if its probative value is substantially outweighed by the danger of unfair prejudice, confusion of the issues, or misleading the jury, or by consideration of undue delay, waste of time, or needless presentation of cumulative evidence."

Osborn's testimony would have had only slight probative value on the question whether the Ellefsens' conduct was willful. "Willfulness requires proof of a voluntary, intentional violation of a known legal duty." United States v. Morse, 613 F.3d 787, 794 (8th Cir. 2010). As set forth above, evidence that the IRS treated the amended tax returns and payments as a final assessment is at best marginally probative of the Ellefsens' willfulness or lack thereof. Accordingly, the district court was correct in its assessment that "it is questionable whether or not this has any relevance in this case." Tr. at 1403.

We further conclude that the testimony would have had little probative value to rebut the government's evidence that the income should be treated as a dividend. We agree with the district court's assessment that "[a]dmission of her testimony would have side-tracked the proceedings in a mini-trial concerning whether the civil division of the IRS had made a final determination regarding Brian's amended tax returns, and if so, how it had treated the amended tax returns." D. Ct. Order of Jan. 11, 2010, at 4. Accordingly, we conclude that the district court did not abuse its discretion in excluding Osborn's testimony.

D. Denial of the Motions for Judgment of Acquittal or New Trial

The Ellefsens contend that the district court erred in denying their motions for judgment of acquittal and for a new trial. We review *de novo* the district court's denial of a motion for judgment of acquittal, applying the same standard as the district court. United States v. Worman, 622 F.3d 969, 977 (8th Cir. 2010). "A conviction will be reversed only if, after viewing the evidence most favorably to the verdict and giving the government the benefit of all reasonable inferences, no construction of the evidence supports the jury's verdict." Id. We review for abuse of discretion the denial of a motion for a new trial. Id.

The Ellefsens contend that they are entitled to judgment of acquittal or a new trial because the government failed to prove willfulness and that the district court "invested too much meaning and credence in one uncorroborated statement of Lynn Bell-Osina in finding sufficient evidence of willfulness." Appellants' Br. at 42. The district court, however, carefully recounted the evidence that showed both Brian and Mark acted willfully. The Ellefsens used a series of domestic and offshore entities to move money from the medical practice to several bank accounts, from which Brian received the benefit of the money without paying taxes on it. Both Brian and Mark received multiple warnings from Stelmacki that the Aegis system was illegal. Bell-Osina testified that in 2000 she informed Mark that the system was illegal and advised him to seek alternate tax counsel and to amend the tax returns. Yet the Ellefsens did nothing until after files were subpoenaed from Stelmacki. The record is replete with evidence to support the jury's finding that Brian and Mark acted willfully. The district court did not err in denying the motion for judgment of acquittal and did not abuse its discretion in denying the motion for a new trial.

E. Restitution

The Ellefsens argue that the government failed to submit evidence to support the restitution amount and that the district court failed to deduct the payments Brian

-18-

submitted with his amended returns from the amount owed to the IRS. The government has the burden of proving by a preponderance of the evidence the restitution owed by the Ellefsens, and we review for clear error the district court's determination of the amount of restitution. United States v. Smiley, 553 F.3d 1137, 1146 (8th Cir. 2009).

The government submitted a proposed restitution order, along with a summary document showing the tax harm for the years charged in the conspiracy. The document listed the amount of additional individual and corporate tax owed for the years 1997 through 2002. The document also showed payments that Brian made when he filed his amended individual tax returns in 2005 and that those payments were deducted from the amount of individual income tax that was owed. Interest was added, pursuant to 26 U.S.C. § 6601, and the total tax liability was calculated to be $1,252,475.58. The government's summary document was supported by documentation showing a detailed explanation of the amount of taxes, penalties, interest, and additional payments, for each year. The government proved the amount of additional taxes at trial, through the testimony of Vandenberg and the evidence of the Revenue Agent Reports for Brian and for SMBJ, Inc. The government established through certified IRS transcripts of accounts the amount of additional taxes that were paid when Brian submitted amended individual tax returns. The Ellefsens have not disputed the interest calculation. Accordingly, the government met its burden of proof and deducted Brian's additional payments from the amount of restitution owed to the IRS. We find no clear error in the district court's judgment, which ordered Brian to pay $1,202,475.58 and Mark to pay $50,000.

III. Conclusion

The convictions and restitution orders are affirmed.

_____