United States Court of Appeals

For the Eighth Circuit

_____

No. 16-3361

_____

United States of America

*Plaintiff - Appellee*

v.

Lisa Ann Davis

*Defendant - Appellant*

_____

Appeal from United States District Court
for the Northern District of Iowa - Cedar Rapids

_____

Submitted: May 9, 2017
Filed: June 14, 2017

_____

Before RILEY and BEAM, Circuit Judges, and ROSSITER,[1] District Judge.

_____

ROSSITER, District Judge.

A jury found Lisa Ann Davis ("Davis") guilty of three crimes related to the manufacture of methamphetamine. Davis appeals her convictions, arguing the district

_____

[1]The Honorable Robert F. Rossiter, Jr., United States District Judge for the District of Nebraska, sitting by designation.

court[2] denied her right to a fair trial by refusing to allow her to present evidence that her doctor prescribed pseudoephedrine to her after she was indicted. Finding jurisdiction exists under 28 U.S.C. § 1291, we affirm.

## I.     BACKGROUND

On October 27, 2015, a federal grand jury charged Davis and her husband, Jody Davis ("Jody"), in a three-count Superseding Indictment. Count 1 alleged that between approximately August 2, 2010, and June 20, 2015, Davis, Jody, and others conspired to manufacture methamphetamine, in violation of 21 U.S.C. §§ 841(a)(1), 841(b)(1)(C), and 846. Count 2 alleged Davis and Jody attempted to manufacture methamphetamine, and aided and abetted the attempted manufacture of methamphetamine, in violation of 18 U.S.C. § 2 and 21 U.S.C. §§ 841(a), (b)(1)(C), and 846. Count 3 charged Davis with possessing pseudoephedrine with intent to manufacture methamphetamine, in violation of 21 U.S.C. § 841(c)(1)-(2).

After Davis entered her initial appearance in the case, she and the government agreed, pursuant to a Stipulated Discovery Order, to provide reciprocal discovery under Federal Rules of Criminal Procedure 16(b) and 26.2. The order required the parties to disclose any experts and provide a written summary of any expert opinions. Neither party designated an expert in accordance with that order.

Shortly before trial, Davis notified the government she intended to call her pulmonologist, Dr. Donald Paynter ("Dr. Paynter"), as a witness. Davis also provided the government with some medical records she had recently obtained. The records disclosed that Dr. Paynter first prescribed pseudoephedrine for Davis on October 28, 2015—several months after Davis was originally indicted, and just three weeks prior to trial.

---

[2]The Honorable Linda R. Reade, United States District Judge for the Northern District of Iowa.

On November 12, 2015, the district court held a pretrial conference at which the government argued (1) Davis's post-indictment prescription was irrelevant because it was given outside the period of the charged conspiracy and (2) Dr. Paynter should not be allowed to give expert testimony because Davis did not disclose him or provide the required expert report. The government did not otherwise object to Dr. Paynter testifying as a fact witness for the defense.

Davis responded that Dr. Paynter would testify about her chronic obstructive pulmonary disease ("COPD") and that she was taking pseudoephedrine "to help her breathe." The district court noted the "substantial" relevance issue presented by the timing of the prescription but reserved ruling on the issue until the challenged evidence could be presented in context.

On November 16, 2015, Jody pled guilty to Count 2 pursuant to a plea agreement. Davis proceeded to trial the next day.

After jury selection, the district court heard additional argument about Davis's post-indictment prescription and Dr. Paynter's expected testimony. Davis's counsel explained he expected Dr. Paynter to testify he prescribed pseudoephedrine to Davis because (1) "Davis was receiving the heat from law enforcement" and (2) it helped with her COPD. The government again objected to Dr. Paynter giving any expert testimony because the government had not received notice and had no chance to hire its own expert. With respect to any fact testimony from Dr. Paynter, the government again requested that the district court "cut it off at the time of the indictment in this case."

Having heard the arguments, the district court ruled as follows:

> The treatment of Lisa Davis by this doctor from whenever until the date of these charges would be admissible, if it's relevant, in terms of treatment protocol, what he did, her diagnosis, and the like. *The prescription that he wrote recently is not admissible because it has no relevance.* If he starts getting into expert testimony as opposed to just

stating his treatment of Lisa Davis, his diagnosis and the like, then it is objectionable and the Court will not allow it in.

I can't rule in advance on those questions because the way a question is phrased in the expert/nonexpert arena with a physician can't be anticipated, but . . . he won't be allowed to testify as an expert because he wasn't listed as an expert, and the government has had no notice and no opportunity to engage an expert to rebut his expert testimony if they wanted to rebut it. So let's be careful on how those things are phrased.

(Emphasis added).

At trial, the government sought to prove that Davis and Jody—with a little help from their friends—worked together to obtain pseudoephedrine and other methamphetamine precursors so they could manufacture methamphetamine at their home. To that end, the government introduced certified records from the National Precursor Log Exchange ("NPLEx"), an electronic pseudoephedrine tracking system implemented in Iowa in 2010. The NPLEx notifies pharmacists when an individual attempts to purchase pseudoephedrine in excess of Iowa's legal limits—3.6 grams per day and 7.5 grams per month. The limits were designed to correspond to the manufacturers' recommendations regarding normal use.

The NPLEx records revealed that, within the time parameters of the charged conspiracy, Davis attempted to purchase pseudoephedrine 163 times at various pharmacies in eastern Iowa. Blocked eight times, Davis's 155 successful purchases yielded 358.10 grams, which Davis equates to approximately two-and-a-half boxes per month for five years. Jody made 166 purchases totaling 385.48 grams and was blocked forty-one times over that same period.

The NPLEx records also showed that the Davises' friends, including Tyrone Jones ("Jones"), Chad Hines ("Hines"), Troy LeClere, Brian LeClere, Noel LeClere, James Kula ("Kula"), and David Dirks ("Dirks") were purchasing pseudoephedrine

for the Davises as well. At trial, some of those friends testified they purchased pseudoephedrine for the Davises—ostensibly to help Davis cope with her COPD.

Due to the Davises' "uncommon" and "excessive" pseudoephedrine purchases, Delaware County Deputy Travis Hemesath ("Deputy Hemesath") began investigating the Davises in May 2015. Deputy Hemesath contacted Jesse Spors ("Spors"), an Asset Protection Manager at a Wal-Mart store where the Davises frequently purchased pseudoephedrine.[3] From Spors, Deputy Hemesath learned the Davises were also purchasing other methamphetamine precursors such as Coleman fuel, rubbing alcohol, lithium batteries, airline tubing, tinfoil, and cold-compress packs.

Electronic surveillance of the Davises in June 2015 combined with the NPLEx records revealed them traveling to stores together to buy pseudoephedrine and other precursors. At one store, the Davises arrived together but separated and bought precursors at different registers at about the same time—a method Deputy Hemesath testified methamphetamine manufacturers use to hide their purchases. In June 2015, Davis purchased pseudoephedrine on the 15th, 17th, and 20th and attempted another purchase on the 16th but was blocked.

On June 20, 2015, after tracking the Davises' movements for most of the day, law-enforcement officers obtained a search warrant for their residence in Hopkinton, Iowa. When the officers executed the warrant, they discovered an illegal methamphetamine lab. Davis was at the kitchen sink "within arm's reach" of numerous precursors and other evidence of the manufacture of methamphetamine, including empty pseudoephedrine boxes, a coffee grinder lid with pseudoephedrine residue on it, and a pie plate in the microwave with methamphetamine residue on it. The rest of the house was likewise littered with evidence of an illegal methamphetamine lab, including a homemade hydrogen chloride gas generator in a bathroom and a crude ventilation system in the basement.

---

[3]Wal-Mart was just one of the twelve stores where the Davises obtained pseudoephedrine over the course of the charged conspiracy.

At trial, the government adduced testimony from Deputy Hemesath, Spors, and others about their investigations of the Davises and entered in evidence numerous exhibits, including Wal-Mart receipts and records, photographs of the Davises' home and its contents, and a large amount of physical evidence seized during the search. The government also introduced evidence under Federal Rule of Evidence 404(b) that Davis had been previously convicted of manufacturing methamphetamine with Jody.

In her defense, Davis maintained she purchased pseudoephedrine legally and solely to treat her COPD and that Jody, a regular user of methamphetamine, was solely responsible for any illegal drug activity. On cross-examination, Davis elicited testimony from Jones, Hines, Dirks, and Kula indicating Jody was the one who asked them to purchase pseudoephedrine for him. Dirks and Brian and Noel LeClere testified that Davis struggled with COPD and that they saw Davis take pseudoephedrine pills to help her breathe.

Davis called Dr. Paynter as her only defense witness. On direct-examination, he confirmed that Davis had long suffered from COPD and sought treatment for years. Dr. Paynter indicated Davis used a nebulizer to assist with her breathing. Davis, reportedly because of the district court's earlier ruling, did not question Dr. Paynter about the prescription or "how pseudoephedrine would or would not assist a person who was having difficulty breathing."

On cross-examination, the government asked Dr. Paynter whether he had prescribed pseudoephedrine during the period of the charged conspiracy. He answered he had not. He also testified Davis did not tell him she was taking pseudoephedrine and said he "certainly would not recommend it specifically for the treatment of COPD or asthma." Davis did not object to the government's line of questioning nor did she address or seek to address the point on redirect.

On rebuttal, the government called Catherine Book ("Book"), a physician's assistant who had been treating Davis for her COPD since 2003. Book testified she never told Davis to use pseudoephedrine. When asked why, Book testified it would

be "contraindicated" for COPD because it would "dry up the lungs." Davis again did not object.

After Book was dismissed, the government rested its case in rebuttal. When offered the opportunity, Davis declined to present any sur-rebuttal evidence. The district court then advised the jury the evidence in the case had concluded and that they would receive the jury instructions after a short break.

After the jury left the courtroom and the district court began to review the jury instructions, Davis asked the district court to reconsider its ruling regarding the admissibility of her post-indictment prescription based on the government's rebuttal evidence. Davis requested permission to recall Dr. Paynter because, in her view, the government reopened the issue by asking Book whether she prescribed pseudoephedrine during the period of the conspiracy. Noting Dr. Paynter was "long gone" and Davis had rested without making an offer of proof, the district court concluded Davis's request was untimely. The district court later permitted Davis to file a copy of the prescription in the record for purposes of appeal.

The district court completed the instruction conference and recalled the jury. The district court read the instructions and then dismissed the jury for lunch. After lunch and before closing arguments, Davis moved for a mistrial based on Book's rebuttal testimony and the exclusion of Davis's prescription, arguing the district court's rulings were "unfair to the defense." The district court denied the motion.

The jury found Davis guilty of all three counts against her. The district court sentenced her to 168 months imprisonment. Davis appeals her convictions.

II.     DISCUSSION

"The Constitution guarantees every criminal defendant a fair trial." *United States v. Bordeaux*, 400 F.3d 548, 558 (8th Cir. 2005). That right includes the

"defendant's right, grounded in the fifth and sixth amendments, to introduce evidence in h[er] own defense." *Id.*; *accord Crane v. Kentucky*, 476 U.S. 683, 690 (1986).

Davis contends her "right to a fair trial was denied when she was not allowed to present evidence of" her post-indictment prescription for pseudoephedrine. According to Davis, that "evidence was critical to corroborate [her] defense that she purchased and possessed pseudoephedrine pills to treat her episodes of difficult breathing," especially after the government produced evidence that she had not been directed to take nor had she received a prescription for pseudoephedrine during the period of time covered by the Superseding Indictment.

Davis asserts that we review the district court's exclusion of her post-indictment prescription for an abuse of discretion. *See, e.g., United States v. Woosley*, 761 F.2d 445, 449 (8th Cir. 1985) ("The district court has considerable discretion in admitting evidence of acts of subsequent conduct of a defendant offered to prove the absence of evil intent."). While that standard of review generally applies to a properly preserved evidentiary challenge, "our review is de novo when the challenge implicates a constitutional right." *United States v. West*, 829 F.3d 1013, 1017 (8th Cir. 2016). "We will reverse, however, only if the error is more than harmless." *United States v. White*, 557 F.3d 855, 857 (8th Cir. 2009) (citing *Chapman v. California*, 386 U.S. 18, 22 (1967)).

"An evidentiary error is harmless if the substantial rights of the defendant were unaffected and the error did not influence or had only a slight influence on the verdict." *United States v. Peneaux*, 432 F.3d 882, 894 (8th Cir. 2005); *accord* Fed. R. Crim. P. 52(a) ("Any error, defect, irregularity, or variance that does not affect substantial rights must be disregarded."). The government bears the burden of proving an error is harmless. *United States v. Olano*, 507 U.S. 725, 734 (1993).

Here, the government—credibly maintaining Davis did not properly preserve the constitutional argument she now makes on appeal—urges us to review only for plain error. *See, e.g., United States v. Letts*, 264 F.3d 787, 789 (8th Cir. 2001)

(reviewing the defendant's constitutional challenges for plain error "because he did not make those claims in the district court"); Fed. R. Crim. P. 52(b) ("A plain error that affects substantial rights may be considered even though it was not brought to the court's attention."). To prevail under plain-error review, the defendant must demonstrate "(1) error, (2) that is plain, and (3) that affects substantial rights. If all three conditions are met, an appellate court may then exercise its discretion to notice a forfeited error, but only if (4) the error seriously affects the fairness, integrity, or public reputation of judicial proceedings." *United States v. Pirani*, 406 F.3d 543, 550 (8th Cir. 2005) (en banc) (quoting *Johnson v. United States*, 520 U.S. 461, 467 (1997)).

"We need not definitively resolve which standard of review applies" in this case because Davis's constitutional claim fails under either standard. *United States v. Johnson*, 715 F.3d 1094, 1100 (8th Cir. 2013); *see also United States v. Pumpkin Seed*, 572 F.3d 552, 561 n.7 (8th Cir. 2009) (concluding "the stricter plain error standard" made "no difference" where the Court found "no error, plain or otherwise, in the [trial] court's exclusion of [the proposed] evidence"). Even if we assume, for purposes of this appeal, that (1) the district court improperly excluded Davis's proposed post-indictment prescription evidence and (2) Davis adequately preserved and presented her constitutional argument to the district court, we conclude the exclusion of that evidence did not affect Davis's substantial rights or materially influence the verdict. *See, e.g.*, Fed. R. Crim. P. 52; *United States v. Dominguez Benitez*, 542 U.S. 74, 81 (2004).

The evidence of Davis's guilt was overwhelming. Certified NPLEx records and law-enforcement surveillance revealed that Davis, Jody, and their friends purchased (sometimes simultaneously) large amounts of pseudoephedrine over the course of the charged conspiracy in ways that indicated it was being used to illegally manufacture methamphetamine. *See, e.g.*, *United States v. Khehra*, 396 F.3d 1027, 1029 (8th Cir. 2005) (per curiam).

The Davises were also recorded buying other methamphetamine precursors, such as Coleman fuel, lithium batteries, and airline tubing, in suspicious ways. When law-enforcement officers searched the Davis home, they found Davis in the middle of a homemade methamphetamine lab "within arm's reach" of several precursors and other physical evidence of the unlawful manufacture of methamphetamine. To underscore Davis's knowledge and intent, the government presented evidence Davis had previously been convicted of manufacturing methamphetamine with Jody.

In contrast, Davis's proposed post-indictment prescription evidence was deeply flawed. Even if marginally relevant to Davis's defense, the prescription she received from Dr. Paynter on October 28, 2015—more than four months after the charged conspiracy ended, almost three months after Davis was originally indicted, and just three weeks before trial—had, at best, minimal probative value as to her intent and actions during the time period charged in the Superseding Indictment. *See*, *e.g.*, *United States v. Giambalvo*, 810 F.3d 1086, 1097 (8th Cir. 2016) ("[T]here is no doubt self-serving exculpatory acts performed substantially after a defendant's wrongdoing is discovered are of minimal probative value as to h[er] state of mind at the time of the alleged crime[s]." (quoting *United States v. Ellefsen*, 655 F.3d 769, 778 (8th Cir. 2011))). This is especially true given the testimony from Dr. Paynter that he "certainly would not recommend [pseudoephedrine] specifically for the treatment of COPD or asthma" and from Book that "pseudoephedrine would be contraindicated" for treating COPD.

What's more, as the government points out, Davis obtained the prescription under questionable circumstances that, at the very least, cast some doubt as to its value. *See*, *e.g.*, *Radtke*, 415 F.3d at 840 (discussing the "ever-present" risk that post-indictment conduct might be "feigned and artificial" (quoting *Post v. United States*, 407 F.2d 319, 325 (D.C. Cir. 1968))). Shortly before her trial was to begin, Davis, evidently for the first time, initiated a discussion about pseudoephedrine with Dr. Paynter. According to Dr. Paynter's notes on October 28, 2015, Davis "complain[ed] about being investigated for pseudoephedrine abuse" because she had

been purchasing what she described as "small amounts" of pseudoephedrine "over the past several years."

In his October 28, 2015, notes, Dr. Paynter indicated he prescribed pseudoephedrine to Davis to see if it might help Davis with her "seasonal allergic rhinitis" (not COPD) and to "minimize suspicion of diversion." When the district court asked Davis's counsel what testimony he expected Dr. Paynter to give at trial, Davis's counsel explained he expected Dr. Paynter to testify he prescribed pseudoephedrine to Davis, in part, because "Davis was receiving the heat from law enforcement."

Under these circumstances, Davis's post-indictment prescription is not the evidentiary panacea she suggests. If nothing else, we are unwilling to say the Constitution requires the admission of post-indictment evidence that results, in part, from an effort to reduce the "heat" a criminal defendant is feeling from a valid law-enforcement investigation.

To be sure, Davis may be correct that her post-indictment prescription evidence—despite its considerable flaws—might have helped her offset the considerable evidence against her and corroborate her innocence defense. But the exclusion of that evidence did not deprive her of "a meaningful opportunity to present a complete defense." *Crane*, 476 U.S. at 690 (quoting *California v. Trombetta*, 467 U.S. 479, 485 (1984)). Though largely contradicted by the balance of the medical evidence, Davis was still able to present her defense that she legitimately bought use quantities of pseudoephedrine to self-treat her COPD during the time at issue. Both of Davis's medical providers confirmed she had COPD, and some of Davis's friends testified on cross-examination that they purchased pseudoephedrine for the Davises—ostensibly to help Davis with her COPD. Some even testified they witnessed her taking the medicine to help her breathe.

"In light of the overwhelming evidence presented by the government" and the minimal value of Davis's proposed evidence, we are satisfied that any alleged error

-11-

in excluding Davis's post-indictment prescription evidence was, at most, harmless. *See*, *e.g.*, *United States v. Thetford*, 806 F.3d 442, 447 (8th Cir. 2015).

## III.    CONCLUSION

We affirm the judgment of the district court.

_____