**[J-93-2019] [MO: Saylor, C.J.]**
**IN THE SUPREME COURT OF PENNSYLVANIA**
**WESTERN DISTRICT**

COMMONWEALTH OF PENNSYLVANIA,    :   No. 8 WAP 2019
                                    :
            Appellee                 :   Appeal from the Order of the
                                    :   Superior Court entered September
                                    :   11, 2018 at No. 1172 WDA 2016,
          v.                     :   vacating the Judgment of Sentence
                                    :   of the Court of Common Pleas of
                                    :   Allegheny County entered June 30,
JAMES CALVIN HAMLETT, JR.,        :   2016 at No. CP-02-CR-0014824-
                                    :   2015 and remanding.
            Appellant               :
                                    :   ARGUED: October 16, 2019

**DISSENTING OPINION**

**JUSTICE WECHT**                                **DECIDED: JULY 21, 2020**

Does the Commonwealth have a burden to establish harmless error? Unless the Majority is inclined to overrule our seminal decision on the harmless error doctrine, the answer incontrovertibly is "yes." *Commonwealth v. Story*, 383 A.2d 155, 162 n.11 (Pa. 1978) ("[T]he burden of establishing that the error was harmless beyond a reasonable doubt rests with the Commonwealth."). Why, then, may a court raise the issue of harmless error *sua sponte*, and then proceed to rule in the Commonwealth's favor thereon, despite the Commonwealth's failure to carry its burden, and despite any attempt by the Commonwealth to raise, assert, cite, discuss, or apply the harmless error doctrine to the facts of the case? The Majority appears to suggest that it has resolved this second question today, but its answer is irreconcilable with the settled answer to the first question. A burden must be satisfied by the litigant who bears it, not by the adjudicator. Otherwise, it is no burden at all.

The essential meaning of a "burden" in the law is readily understood by judges, lawyers, law students, scholars, television commentators, and laypersons alike. It means that there is some kind of obligation to carry one's point, lest the point be lost. This might make the question before us appear to have an obvious answer. Not so. The jurisprudential waters have significantly muddied over the last two decades. The crux of today's appeal is the "tension" that has grown within our harmless error jurisprudence, a tension that manifests itself in two divergent lines of precedent. On the one hand, there is the fundamental principle, recognized by the Supreme Court of the United States in *Chapman v. California*, 386 U.S. 18 (1967), and by nearly every court that has followed, that it is the prosecution's burden to establish the harmlessness of an error that potentially tainted a defendant's conviction. *See id.* at 24; *Story*, 383 A.2d at 162 n.11; *Commonwealth v. Davis*, 305 A.2d 715, 719 (Pa. 1973).[1] On the other hand, there is this

---

[1] State courts overwhelmingly recognize this burden. The cases are legion. *See, e.g., State v. James*, 443 P.3d 1063, 1079 (Kan. 2019) ("The burden of demonstrating harmlessness is on the party benefiting from the error, which, in this case, is the State."); *Coleman v. Binion*, 829 S.E.2d 1, 26 (W.Va. 2019) ("In a criminal case, the burden is upon the beneficiary of a constitutional error to prove beyond a reasonable doubt that the error complained of did not contribute to the verdict obtained.") (citation and internal quotation marks omitted); *State v. Larkin*, 183 A.3d 589, 595 (Vt. 2018) ("The State bears the burden of proving that an error . . . is harmless."); *State v. Rivas*, 398 P.3d 299, 313-14 (N.M. 2017) ("For a non-structural, constitutional error as has been established here, the State bears the burden of proving beyond a reasonable doubt that the error was harmless to the outcome."); *State v. DeLeon*, 374 P.3d 95, 100 (Wa. 2016) ("The State bears the burden of showing that the constitutional error was harmless."); *State v. Perry*, 245 P.3d 961, 973 (Idaho 2010) (constitutional error necessitates reversal "unless the State proves beyond a reasonable doubt that the error complained of did not contribute to the verdict obtained") (citation and internal quotation marks omitted); *State v. Sayles*, 49 S.W.3d 275, 280 (Tenn. 2001) ("Once a constitutional error has been established . . . the burden is upon the State to prove that the constitutional right violation is harmless beyond a reasonable doubt.") (citation and internal quotation marks omitted); *Dawson v. State*, 608 A.2d 1201, 1204 (Del. 1992) ("The defendant has the initial burden of demonstrating error. If the defendant is successful in discharging that obligation, the burden of proof shifts to the State.").

Court's more recent suggestion that an appellate court's *sua sponte* invocation of the harmless error doctrine is a permissible exercise of the court's prerogative to apply the right-for-any-reason doctrine—a notion floated in an undeveloped footnote in *Commonwealth v. Mitchell*, 839 A.2d 202, 215 n.11 (Pa. 2003), and applied by this Court on a handful of occasions since.

Where our precedents hold simultaneously that there is a burden placed upon a party and that the court may elect at will to shoulder that burden itself, the precedents are incompatible. I would preserve the foundations of the harmless error doctrine, adhere to *Story*, and disavow our *Mitchell* line of cases. I would enforce the burden recognized in *Chapman*.

---

Every United States Court of Appeals that adjudicates criminal cases also has come to the same conclusion. *See, e.g.*, *United States v. Rivera-Carrasquillo*, 933 F.3d 33, 47 (1st Cir. 2019) ("The government bears the burden of proving harmlessness."); *United States v. Groysman*, 766 F.3d 147, 155 (2d Cir. 2014) ("With respect to harmless-error analysis, the government bears the burden of proof."); *United States v. Franz*, 772 F.3d 134, 151 (3d Cir. 2014) ("The government bears the burden of establishing harmlessness."); *United States v. Garcia-Lagunas*, 835 F.3d 479, 488 (4th Cir. 2016) ("The burden rests on the government, the beneficiary of the error, to show harmlessness."); *United States v. Gutierrez-Mendez*, 752 F.3d 418, 426 (5th Cir. 2014) ("The government has the burden of establishing harmlessness beyond a reasonable doubt."); *United States v. Susany*, 893 F.3d 364, 368 (6th Cir. 2018) ("The government bears the burden of proof on harmless error . . . ."); *United States v. Robinson*, 724 F.3d 878, 888 (7th Cir. 2013) ("The burden of demonstrating harmlessness rests with the government."); *United States v. Davis*, 859 F.3d 592, 597 (8th Cir. 2017) ("The government bears the burden of proving an error is harmless."); *United States v. Esparza*, 791 F.3d 1067, 1074 (9th Cir. 2015) ("The government bears the burden of proving that the error was harmless beyond a reasonable doubt."); *United States v. Russian*, 848 F.3d 1239, 1248 (10th Cir. 2017) ("The government bears the burden of making this [harmlessness] showing."); *Bester v. Warden*, 836 F.3d 1331, 1338 (11th Cir. 2016) ("The government, not the defendant, bears the burden of establishing that a constitutional error is harmless."); *United States v. Burnett*, 827 F.3d 1108, 1119 (D.C. Cir. 2016) ("The government bears the burden of proving harmless error.") (internal citation and quotation marks omitted).

The Majority chooses a different path, opting to provide no standard at all. Ultimately, the Majority holds that a court may assume the Commonwealth's burden "in appropriate cases." Maj. Op. at 9. The court may conduct a harmless error analysis on its own initiative, the Majority reasons, pursuant to its "discretionary prerogative." *Id.* at 10. Both the Majority and the Concurrence suggest some understanding that our appellate courts are expected to glean from today's decision, pursuant to which jurists will recognize their *sua sponte* invocation of harmless error to be an "exception to the ordinary rule," *id.* at 9, one that must be used with caution in response to the "extremely occasional need," Conc. Op. at 2 (Donohue, J.), to do the Commonwealth's job for it. I too am concerned by the "superficiality" with which harmless error analyses are commonly conducted. Maj. Op. at 12. But I find no practical limitations here, no standard, no rubric by which to distinguish an "appropriate" case from an inappropriate one, and no reason to expect that this purported "exception" to a litigant's burden will prove to be anything other than the norm, to the extent that the exception has not swallowed the rule already.

There is a straightforward path toward mitigating many of the problems that Appellant Hamlett has brought to our attention—a path grounded in the foundational case law from which we have departed. We should preserve the burden, in a form that is recognizable as such.

The Majority does not discuss much of the jurisprudence underlying this inquiry. The Majority does not discuss the facts or history of this case, nor the intermediate court's application of the law to the facts. *See infra* Part IV. Aside from a footnote providing citations to the decisions of this Court that Hamlett specifically challenges, Maj. Op. at 4 n.3, the Majority does not meaningfully confront the precedents at issue. The harmless error doctrine has a long history; the approach that this Court embraces today is of a more

recent vintage. In order to frame the question presented,[2] to appreciate Hamlett's criticisms of the approach that the Court embraces today, and to articulate the grounds for my profound disagreement with the Majority, it is necessary to set forth some background. It is imperative to understand the competing interests at play, to review the guiding principles of the doctrines at issue, and to consider where our jurisprudence has brought us and where it will go from here.

## I.

Harmless error often is treated as a routine matter in the law, but we must remain cognizant of the stakes of the inquiry before us. To the individual appellant whose case is under review, the importance of the inquiry is immense—a harmless error analysis often represents the line between an accused's entitlement to relief and the failure of his appeal. A finding of harmlessness deals a knockout blow, simultaneously acknowledging the merit in the appellant's assertion of legal error while nonetheless informing the

---

[2] The Majority does not quote the question presented. We granted allowance of appeal on the following question, which we rephrased for clarity:

> Can the tension between the well-settled rule that the Commonwealth bears the burden of demonstrating harmless error beyond a reasonable doubt and the contradictory principle that an appellate court has the ability to affirm a valid judgment or verdict for any reason appearing as of record be reconciled? If these conflicting principles must be reconciled in favor of the Commonwealth proving harmlessness beyond a reasonable doubt, did the Superior Court err in finding harmless error *sua sponte*?

*Commonwealth v. Hamlett*, 202 A.3d 45 (Pa. 2019) (*per curiam*).

The Majority states that, due to Hamlett's framing of the appeal, "the issue does not encompass the narrower question of whether the Superior Court may have erred in the substantive aspects of its harmless-error review." Maj. Op. at 3 n.2. However, because this Court rephrased the question presented, this conclusion is somewhat suspect. Because it is emblematic of certain problems in our jurisprudence, and because the Majority holds that such analyses may be conducted *sua sponte* in any event, I believe that the Superior Court's present application of the harmless error doctrine warrants at least brief comment. *See infra* Part IV.

appellant that no remedy for that error will be forthcoming. And beyond the individual case lie important institutional concerns. In *Story*, we cautioned that "there is the danger that a lenient harmless error rule may denigrate the interests and policies which both constitutional and non-constitutional rules promote." *Story*, 383 A.2d at 164. We further admonished that "courts must be careful in applying the harmless error rule, for if the violation of a rule is too readily held harmless, the importance and effectiveness of the rule is denigrated." *Id.* This unpleasant side effect not only can dilute and defeat important rights, but also can undermine the deterrence value of appellate reversal, demonstrating to future parties and courts that similar errors are inconsequential, and that scrupulous care need not be taken to avoid them.[3] A rule that frequently is broken without consequence soon becomes no rule at all.

There is, of course, another side to this coin. It would be unreasonable to demand perfection throughout the entire course of a criminal prosecution and trial. For that reason, it is a longstanding tenet of our law that, "although an accused is entitled to a fair trial, he is not entitled to a perfect one." *Story*, 383 A.2d at 164. Modern harmless error doctrine developed in the early twentieth century as a response to a "widespread and deep conviction" that appellate review of criminal cases had grown too demanding, and that appellate courts had become "'impregnable citadels of technicality'" that often reversed hard-won convictions on the basis of trivial irregularities. *Kotteakos v. United States*, 328 U.S. 750, 759 (1946) (quoting Marcus A. Kavanagh, *Improvement of*

---

[3] *See* Hon. Harry T. Edwards, *To Err Is Human, But Not Always Harmless: When Should Legal Error Be Tolerated?*, 70 N.Y.U. L. REV. 1167, 1170 (1996) (hereinafter "Edwards") ("When we hold errors harmless, the rights of individuals, both constitutional and otherwise, go unenforced. Moreover, the deterrent force of a reversal remains unfelt by those who caused the error. In his seminal book on harmless error, entitled The Riddle of Harmless Error, the late Justice Roger Traynor aptly observed that '[i]n the long run there would be a closer guard against error at the trial, if appellate courts were alert to reverse, in case of doubt, for error that could have contaminated the judgment.'") (quoting ROGER J. TRAYNOR, THE RIDDLE OF HARMLESS ERROR 23 (1970)) (footnotes omitted).

*Administration of Criminal Justice by Exercise of Judicial Power*, 11 A.B.A.J. 217, 222 (1925)).  Undoubtedly, it is inefficient to order the repetition of an entire trial because of an immaterial error that could not possibly have affected the outcome.  Thus, the "harmless error rule can save the time, effort and expense of unnecessary retrials where the defendant has not been prejudiced by an error."  *Story*, 383 A.2d at 164.  But because the individual and institutional stakes are high, a balance must be struck:  the rule must aim to "save the good in harmless-error practices while avoiding the bad, so far as possible."  *Chapman*, 386 U.S. at 23.

Both the Supreme Court of the United States and this Court historically struck that balance by constraining the harmless error doctrine with two fundamental rules.  First, before an error may be deemed harmless, "the court must be able to declare a belief that it was harmless beyond a reasonable doubt."  *Davis*, 305 A.2d at 719 (quoting *Chapman*, 386 U.S. at 24).  "The second general precept" is that "the burden is on the Commonwealth to establish that the error was harmless."  *Id.* at 719; *see Chapman*, 386 U.S. at 24; *Story*, 383 A.2d at 162 n.11.  The beyond-a-reasonable-doubt standard is commensurate with the prosecution's burden at trial, and it would make little sense for an appellate court to apply a lesser standard to the harmlessness inquiry.  *Story*, 383 A.2d at 162.  Moreover, this Court has explained, the beyond-a-reasonable-doubt standard reflects the prudent belief that "it is far worse to conclude incorrectly that the error was harmless than it is to conclude incorrectly that the error was reversible."  *Davis*, 305 A.2d at 719.

It is the "second general precept" of harmless error jurisprudence that is on the chopping block today.  *Davis*, 305 A.2d at 719.  Fundamentally, the purpose of assigning the burden to the prosecution is to minimize the potential for unfairness to the appellant, for it is the prosecution that benefits from the finding of harmlessness.  The Supreme

Court of the United States has explained that trial error "casts on someone other than the person prejudiced by it a burden to show that it was harmless." *Chapman*, 386 U.S. at 24. "It is for that reason that the original common-law harmless-error rule put the burden on the beneficiary of the error either to prove that there was no injury or to suffer a reversal of his erroneously obtained judgment." *Id.* Although there are additional practical challenges in the application of the doctrine, these two essential safeguards—the governing standard and the assignment of the burden—maintain the relative balance in the competing interests that underlie harmless error, and restrain the doctrine from embracing too much of "the bad" about which *Chapman* warned us.

In the past two decades, however, this Court began to distort this balance, tipping the scales in favor of the prosecution. In *Mitchell*, a capital direct appeal, this Court agreed with the appellant that the trial court had erred in permitting the prosecutor to impeach the appellant's testimony at trial by reference to his exercise of his right to remain silent. The Court proceeded to a harmlessness inquiry. In a footnote that ultimately would engender the so-called "tension" in our jurisprudence that we confront today, this Court stated:

> Inexplicably, in this case the Commonwealth offers no alternative argument that the error was harmless, as it simply argues that no error occurred. We remind the Commonwealth that the burden of establishing harmless error rests squarely upon its shoulders. *Story*, 383 A.2d at 162 n.11. Despite this lapse by the Commonwealth, we are not without advocacy on this issue as the question of harmless error was directly raised and addressed by Appellant. Jurisprudentially, we can affirm the action of the court below on other grounds. *Bearoff v. Bearoff Bros., Inc.*, 327 A.2d 72, 76 (Pa. 1974).

*Mitchell*, 839 A.2d at 215 n.11(citation modified).

Although the *Mitchell* footnote is brief, there is much to unpack in it. It is evident that *sua sponte* invocation of harmless error was not commonplace at the time, as demonstrated by this Court's scolding of the Commonwealth for its "lapse" in failing to

carry its burden—an oversight that this Court found "inexplicable." Nonetheless, with a touch of judicial sleight of hand, this Court escaped the suggestion that it had raised the issue *sua sponte* at all, capitalizing upon the *appellant's* foresight to have argued that the error was *not* harmless, and proceeding then to deem that sufficient "advocacy" to decide the issue. In one sentence, this Court flipped the longstanding burden on its head. The Commonwealth wholly failed to address, let alone meet, its burden; the appellant not only met his own burden to prove error, but went above and beyond to preempt the harmlessness argument that the appellant anticipated but which the Commonwealth itself never advanced. As a reward for his diligence, this Court held that the appellant effectively had satisfied his *opponent's* burden. It appears that the appellant would have been better served by less punctilious advocacy. Finally, without any reasoned analysis or discussion, this Court cited a single civil case referring to the right-for-any-reason doctrine, ostensibly as a justification for its decision to engage in harmless error analysis despite the Commonwealth's failure to litigate the matter at all. This Court did not acknowledge that its approach facially conflicts with the universal understanding of a "burden" in the law as an obligation upon a *party* to prove the claim, or else to suffer defeat.

Mitchell and its progeny embody the dangers of bad precedent. As sometimes happens, what began as merely an underdeveloped excuse for an unsound decision soon became the norm. In *Commonwealth v. Moore*, 937 A.2d 1062 (Pa. 2007), this Court again confronted an error as to which the Commonwealth had failed to advance a harmlessness argument. Citing *Mitchell*, this Court again paid lip service to the waning premise that the burden to prove harmless error falls upon the Commonwealth. Yet, the Court again invoked the right-for-any-reason doctrine as a basis to overlook the Commonwealth's omission. *See id.* at 1073. *Mitchell* had metastasized into a line of

precedent, binding upon this Court and all below, despite its patent but unacknowledged conflict with *Story*, *Davis*, *Chapman*, and the foundational tenets of harmless error doctrine. By the time this Court decided *Commonwealth v. Allshouse*, 36 A.3d 163 (Pa. 2012), *Mitchell*'s approach was so engrained that the Court started simply citing the right-for-any-reason doctrine as a justification for *sua sponte* consideration of harmless error without even referring to the Commonwealth's burden as such. *See id.* at 182 ("It is well settled that an appellate court has the ability to affirm a valid judgment or verdict for any reason appearing as of record . . . . This Court may affirm a judgment based on harmless error even if such an argument is not raised by the parties.") (citation and internal quotation marks omitted).

This Court's treatment of harmless error grew increasingly casual. In *Commonwealth v. Hitcho*, 123 A.3d 731 (Pa. 2015), another capital direct appeal, this Court not only ignored the existence of a burden on the question of harmlessness, but, unlike earlier cases in this line, glossed over the fact that the Commonwealth had not advanced a harmlessness argument.[4] After spending over a decade with the *Mitchell* footnote, it was no longer "inexplicable" that the Commonwealth had failed to carry its burden; the prosecution now could count on this Court to do the job for it. In *Hitcho*, this Court further abbreviated the analysis. The Court not only performed a harmlessness assessment on the Commonwealth's behalf, it also declined even to consider a claim of error. This Court held that "we need not resolve the issue of whether the trial court abused its discretion in denying Appellant's motion *in limine* . . . . Assuming, *arguendo*, the trial

---

[4] The Commonwealth's brief in *Hitcho* made a single, passing reference to harmless error in the context of one discrete claim, but did not develop an argument on the matter, and did not refer to the "overwhelming evidence" standard that we would deem dispositive of a wholly different claim of error. Brief for Commonwealth, *Commonwealth v. Hitcho*, 691 CAP, at 29 ("Even if [Pa.R.E. 106] was applicable, which it is not, the error would be harmless error."). The analysis that I discuss was undertaken by this Court *sua sponte*.

court erred, given the overwhelming evidence establishing first-degree murder, we find any error to be harmless, and thus not warranting relief." *Hitcho*, 123 A.3d at 748. Putting the proverbial cart before the horse, the Court found harmlessness without finding error.[5]

Absent any advocacy from the parties on the question, and instead forging ahead *sua sponte*, this Court then disregarded that the "overwhelming evidence" variety of harmless error necessitates that the evidence be *uncontradicted*—a requirement that prevents the reviewing court from making questionable assessments of the credibility of competing evidence from its inherently limited appellate perspective.[6] As *Story* stated:

> The requirement that the "overwhelming" evidence relied upon be uncontradicted follows from the principle that an error cannot be harmless if "'honest, fair minded jurors might very well have brought in not guilty verdicts.'" *Davis*, 305 A.2d at 721 (quoting *Chapman*, 386 U.S. at 18). A jury has the duty to weigh the evidence and resolve conflicts therein. *E.g.*, *Commonwealth v. Murray*, 334 A.2d 255 (Pa. 1975). Unless the evidence

---

[5] We took a similar approach in *Allshouse*, 36 A.3d at 182. Although we are not the first court to conduct such an analysis, and certainly will not be the last, this practice also raises self-evident doctrinal concerns. *See* Edwards, *supra* n.3, at 1182 ("Another troubling aspect of this trend is judicial use of the harmless-error rule to avoid reaching a difficult issue in a case. Courts sometimes openly decline to decide whether a defendant's rights have been violated, instead evading the issue by stating that any error that might have occurred was harmless. This practice leaves unresolved the question of whether an error even occurred, thus offering no guidance to trial courts. What may be an important question of trial error is therefore sidestepped by the application of a doctrine that itself presupposes the existence of such an error. Nothing suggests that the harmless-error rule was meant to serve such a purpose.").

[6] For ease of reference, this Court traditionally recognizes three varieties of harmless error, which we have gleaned from our seminal discussion in *Story*:

> Harmless error exists if the reviewing court is convinced from the record that (1) the error did not prejudice the defendant or the prejudice was *de minimis*, (2) the erroneously admitted evidence was merely cumulative of other untainted evidence, or (3) the properly admitted and *uncontradicted evidence of guilt* was so overwhelming and the prejudicial effect of the error was so insignificant by comparison that the error could not have contributed to the guilty verdict.

*Commonwealth v. Petroll*, 738 A.2d 993, 1005 (Pa. 1999) (emphasis added).

> is uncontradicted a fair minded juror may well choose to credit the defendant's, rather than the Commonwealth's evidence.
>
> The principle is in accord with the proper function of an appellate court. An appellate court is ill equipped to resolve conflicts in the evidence or make findings of fact.

*Story*, 383 A.2d at 167-68 (citations modified). Although the *Hitcho* Court quoted precedent that identified the correct standard, it nonetheless ignored this important element, and instead expressly rested its "overwhelming evidence" assessment, in part, upon an appellate credibility finding. The Court concluded that the defendant's testimony, which "offered an explanation for his actions to the jury" and, thus, ostensibly contradicted at least portions of the Commonwealth's evidence or the inferences derived therefrom, was "fraught with inconsistencies and based on an unbelievable version of events." *Hitcho*, 123 A.3d at 748. In other words, this Court deemed a (potential) error harmless, *sua sponte*, based at least in part upon its own *post hoc* assessment of the defendant's credibility, which the Court somehow gleaned on appeal from a cold record. Such disregard for established standards sets a poor example for our courts, and does not inspire confidence in the soundness of this line of precedent.

The *Mitchell* line of cases never overruled our landmark decision in *Story*, never disapproved of its progeny, and never disputed the longstanding and well-settled principle that the burden to prove harmlessness rests with the prosecution. *See supra* at 2 & n.1. The cases also never recognized the contradiction—they merely cited the right-for-any-reason doctrine, then proceeded *sua sponte* as though the tension were resolved. But the tension remains. I addressed it directly in dissent in *Commonwealth v. Hicks*, 156 A.3d 1114, 1158 n.1 (Pa. 2017) (Wecht, J., dissenting), and the Superior Court in this case quoted my concerns before proceeding *sua sponte* to address harmlessness. *See* Maj. Op. at 2; *Commonwealth v. Hamlett*, 1172 WDA 2016, slip op. at 28 n.8, 2018 WL

4327391, at *13 n.8 (Pa. Super. Sept. 11, 2018).[7]  Hamlett identified the need for this Court to confront the matter, brought us this important appeal, and has directly framed this significant problem in our law with a challenge to the conflicting precedent.  And so, here we are.

## II.

The Majority does not concern itself with the soundness of the *Mitchell* line of cases, *see* Maj. Op. at 4 n.3, nor does it address the interests of the accused that are implicated by harmless error review.  Although it rejects various of Hamlett's arguments, in a manner that I address *seriatim* below, the Majority articulates one central conclusion to explain why *sua sponte* review for harmless error is permissible, notwithstanding the Commonwealth's failure to make any attempt to carry its burden of persuasion:  "[t]he harmless-error doctrine functions as the underlying substantive principle of law, and the right-for-any-reason precept merely provides the explanation for when and why an appellate court may exercise its discretionary prerogative to proceed of its own accord to preserve a valid verdict in appropriate circumstances."  Maj. Op. at 9.

This is not a satisfactory answer.  Whether the verdict to be preserved is "valid" is precisely the question that a harmless error analysis seeks to answer, and the answer

---

[7]    Although my dissent in *Hicks* expressed skepticism about this facet of our harmless error jurisprudence, I felt bound there to "adhere to our precedential declaration" that *sua sponte* invocation of harmless error is permissible under the *Mitchell* line of cases.  *Hicks*, 156 A.3d at 1158 n.1 (Wecht, J., dissenting) (citing *Allshouse*, 36 A.3d at 182).  Upon review of the authorities and Hamlett's focused, well-developed advocacy, I am compelled now to take a more exacting view.  We should disavow the flawed precedent that generated the present controversy.

As the Majority notes, Justice Baer's concurrence in *Hicks* also recognized our precedential conflict, but resolved it in favor of *sua sponte* invocation of harmless error via the right-for-any-reason doctrine.  Maj. Op. at 3; *Hicks*, 156 A.3d at 1140 (Baer, J., concurring).  Because this rationale is duplicative of that of the *Mitchell* line of cases, and reflects the same reasoning that the Majority adopts today, I will not separately address Justice Baer's comments in *Hicks*.

cannot be known before the inquiry is conducted. *Sua sponte* application of the doctrine disregards a crucial component of the "underlying substantive principle of law." It is the prosecution's burden to establish harmless error. The court undertaking the analysis *sua sponte* is not so much applying the substantive principle as it is applying *part* of that principle, and dismissing the inconsistent part. The Majority characterizes the challenged practice as a straightforward, *sua sponte* application of the right-for-any-reason doctrine, but it is more accurately characterized elsewhere by the Majority as an "exception" to the "ordinary rule," *id.*, that the Commonwealth bears a burden on the question of whether a given error was harmless, or instead whether legal error, once identified, warrants relief. With no discernible standard to constrain the exception, I fail to understand what is left of the "ordinary rule."

Additionally absent from the Majority's analysis is any recognition of the oft-repeated reasons that *sua sponte* decision-making is roundly disfavored in the law. Even setting aside the express burden applicable in the harmless error context, it is axiomatic that "[s]ua sponte consideration of issues deprives counsel of the opportunity to brief and argue the issues and the court of the benefit of counsel's advocacy." *Wiegand v. Wiegand*, 337 A.2d 256, 257 (Pa. 1975). Raising and addressing issues *sua sponte* "disturbs the process of orderly judicial decision-making by depriving the court of the benefit of counsel's advocacy, and depriving the litigants the opportunity to brief and argue the issues." *Johnson v. Lansdale Borough*, 146 A.3d 696, 709 (Pa. 2016) (citations omitted). But beyond mere prudential challenges, and of particular relevance given Hamlett's specific argument to this Court, *sua sponte* decision-making may implicate due process concerns, to the extent that it deprives litigants of notice and an opportunity to be heard on potentially dispositive matters. *See infra* Part II(D). Before delving further into broader concerns, however, I turn next to the Majority's various rationales for rejecting

several of Hamlett's specific arguments, and the reasons for my disagreements with these rationales.

## A.     Judicial Economy

The Majority first invokes principles of judicial economy, noting the "systemic interest in avoiding costly and unnecessary proceedings before the judiciary" and the "social costs of retrial, including those of the judicial system at large, jurors, victims, other witnesses, and the general public." Maj. Op. at 10. Due to these interests, the Majority asserts, "[j]udicious recourse to the discretionary prerogative to review for harmless error may appropriately proceed" *sua sponte*, when the court deems it appropriate. *Id.*

First, the Majority's justification begs the question inasmuch as it relies upon the interest in avoiding "unnecessary" retrials, which again is precisely the question that a harmless error analysis seeks to answer. Through the harmless error doctrine, the parties litigate, and the court decides, whether it is a "valid verdict," *id.* at 9, that the prosecution seeks to preserve despite an error, such that a retrial becomes "unnecessary." *Id.* at 10. The answer to the question is meant to be provided through the parties' advocacy—the Commonwealth's, specifically—not through judicial intuition.

Moreover, the Majority refers only to interests that underlie the harmless error doctrine *generally*, but which have little relation to the question of the Commonwealth's burden. As it concerns the question before us, the typical framing of the interest in judicial economy is largely beside the point. It is no secret that the harmless error doctrine, at bottom, is informed significantly by principles of judicial economy. But that interest is in no way incompatible with the Commonwealth's advocacy. Indeed, requiring the Commonwealth to carry its burden *advances* judicial economy in many ways, while *sua sponte* consideration of harmless error directly and palpably *disserves* the interest in judicial economy. Precisely because it is a highly record-intensive inquiry, harmless error

analysis is a labor. If it is to be conducted with due rigor, the burden to establish the claim must fall somewhere. As I explain below, in allowing the Commonwealth's burden to be relieved in the appellate court's discretion, the Majority spares none of the resources of our trial courts, but allows a heavy workload to fall upon our already-busy appellate courts.

Setting aside precedent, fairness, important underlying interests, and institutional concerns, perhaps it is helpful to discuss the reasons that the Commonwealth is better suited than the appellate court to advocate for harmless error, as a purely practical matter. Although appellate courts regularly review evidentiary records, we necessarily maintain a relatively detached relationship with them. When we first open the papers filed in a given appeal, we have no prior knowledge of the case. We were not in the courtroom at trial, nor have we observed any witness' demeanor, nor have we seen the parties' pre-trial or post-trial motions, nor have we heard their objections or offers of proof. We and the record simply are not acquainted. We rely heavily upon the lower courts' summaries of the facts and proceedings, and to a lesser extent the parties' representations, in order to orient ourselves to the legal questions presented for review. Naturally, those questions generally require us to consult the record, but we tailor our review to the issues before us, and we require that the parties provide us with citations to the portions of the record that contain the pertinent material. *See, e.g.*, Pa.R.A.P. 2119(c) ("If reference is made to the pleadings, evidence, charge, opinion or order, or any other matter appearing in the record, the argument must set forth, in immediate connection therewith, or in a footnote thereto, a reference to the place in the record where the matter referred to appears"). We require such citation precisely because it is both onerous and inefficient for an appellate court to embark upon a self-guided tour through an unfamiliar fact record.[8]

---

[8]    *Cf. United States v. Hasting*, 461 U.S. 499, 516-17 (1983) (Stevens, J., concurring in the judgment) ("This Court is far too busy to be spending countless hours reviewing trial transcripts in an effort to determine the likelihood that an error may have affected a

Unlike the appellate court, the parties are intimately familiar with the fact record. They built it. They know how its pieces fit together. The parties were in the courtroom. They filed the motions. They presented the evidence and questioned the witnesses. They argued the case to the fact-finder. They studied the materials in preparation for appeal. It is they who have command of the record, and it is they who can direct the reviewing court to the portions thereof that support or undercut their respective positions. Accordingly, it is the Commonwealth, not an appellate court reviewing a cold record months, years, or even decades later, that is in the best position to establish the harmlessness of an error. The Commonwealth is well-equipped to identify and draw the court's attention to, for instance, the remainder of the uncontradicted evidence asserted to be overwhelming, or the properly introduced evidence of which the erroneous evidence was merely cumulative. *See supra* n.6.

In the absence of any argument from the Commonwealth, the appellate court is left in unfamiliar terrain without a guide. In order to render its judgment with any degree of confidence, the court seeking to establish harmless error on its own initiative must commence an exacting, systematic, and laborious review of the record with no direction from the parties. This is plainly a burdensome exercise for any appellate court. *See, e.g.*, *United States v. Giovannetti*, 928 F.2d 225, 226 (7th Cir. 1991) (*per curiam*) (noting that *sua sponte* consideration of harmless error "would place a heavy burden on the reviewing court, deprived as it would be of the guidance of the parties on the question whether particular errors were harmless"). This is not a revolutionary observation.

---

jury's deliberations. . . . I have spent several hours reviewing the one copy of the trial transcript that has been filed with the Court. But I have not read all of its 1,013 pages, and I have read only a few of the 450 pages of the transcript of the suppression hearing. The task of organizing and digesting the testimony is a formidable one.").

Certainly, in both the right-for-any-reason and harmless error contexts, the interest in judicial economy often refers to the avoidance of unnecessary retrials—surely a considerable burden upon our trial courts. *See* Maj. Op. at 10. But, from the trial court's perspective, it does not matter at all whether it is the Commonwealth or the appellate court that makes the harmlessness showing. If an error is to be deemed harmless, the end result—affirmance—is the same, and the resources of the trial court are spared to precisely the same degree regardless of whether the Commonwealth satisfies its burden or the appellate court shoulders that burden itself. The difference is that, where the parties litigate the matter and guide the court through the fact record, the analysis can be completed much more quickly, efficiently, and with greater confidence in the outcome. By contrast, where the Commonwealth fails to carry its burden, and the appellate court undertakes a self-directed harmless error analysis, the court must enmire itself in the record, parse it for any and all potentially relevant details, and thereby expend a significant amount of the court's time and resources, at the expense of other cases on its docket.

There can be no serious argument that it is not at least preferable for the Commonwealth to provide the reviewing court with meaningful advocacy on a potentially challenging, highly record-intensive inquiry such as harmless error. It is for this reason that the crux of Hamlett's argument regarding judicial economy is that, although "the practice of *sua sponte* review for harmless error might hypothetically advance judicial economy in the trial courts, it does so at the expense of judicial economy in the appellate courts." Brief for Hamlett at 38. This is plainly true, but with one caveat. Condoning the practice of *sua sponte* review advances judicial economy in the trial court *only* if we assume that the Commonwealth, if required, would regularly fail to perform its duty as an advocate, and that it somehow becomes the appellate court's role to do the Commonwealth's job as an alternative to the consequence that should rightly follow from

the Commonwealth's dereliction.  The procedure by which a judgment is affirmed on appeal is of no particular concern to the trial court.

The Majority's focus upon judicial economy extends only to the harmless error doctrine's standard, general admonitions relating to the costs of retrial.  None of that is inconsistent with the placement of a burden upon the Commonwealth, nor with requiring the Commonwealth to carry that burden.  The Majority criticizes a number of Hamlett's arguments as "impugning harmless-error review as such, as distinguished from the *sua sponte* aspect."  Maj. Op. at 11 n.9.  Yet, a number of the Majority's "primary lines of attack," *id.*, also rely upon principles applicable to harmless error review as such, as distinguished from the *sua sponte* aspect.  Avoidance of the "societal costs" of unnecessary retrials is wholly compatible with the Commonwealth advocating for its position.  The *sua sponte* component of this jurisprudence has never concerned itself with the fact that the appellate court is doing the actual work of conducting self-guided harmless error analyses, which speaks volumes about the law's concern for judicial economy.  By contrast, if the Commonwealth advocates for its position, every step of the appellate process becomes more efficient.

The most reasonable solution to these problems, from a judicial economy perspective, is that the Commonwealth must be made to carry its burden.  If we begin to enforce the burden, the Commonwealth will learn to carry it again.  It was once "inexplicable" for the Commonwealth to so fail.  *Mitchell*, 839 A.2d at 215 n.11.  Opting instead to find harmlessness *sua sponte* changes nothing in the trial courts, but shifts a heavy workload onto our busy appellate courts.  It saves no precious judicial resources.  It expends them.  The entire exercise spares the effort of one party alone—the Commonwealth.  *Sua sponte* harmless error review is not judicial economy.  It is prosecutorial economy.

## B.  Right-For-Any-Reason

I would prefer not to dwell at great length upon the right-for-any-reason doctrine, nor upon its conflation with the harmless error doctrine, because I think it plain that the two doctrines are indeed distinct, that they have distinct purposes, and that there is a reason that they were given distinct names in the first place.  I also believe that the *sua sponte* practice that the Majority approves is not actually an application of the right-for-any-reason doctrine, but rather that it is simply an attempt to apply harmless error principles on the court's own initiative, with the Commonwealth's burden conspicuously absent from the analysis.  But the ostensible connection between these doctrines is the jurisprudential anchor of the Majority's approach, so it is worth considering the ways in which harmless error and the right-for-any-reason doctrine converge and diverge.

To separate the right-for-any-reason doctrine from harmless error, Hamlett proposes a taxonomy to this Court, suggesting that trial error be classified as either error of "admission," "use," or "rationale."  Brief for Hamlett at 17-23.  He argues that only errors in rationale are amenable to disposition under the right-for-any-reason doctrine, because, in such a circumstance, the admission or use of the evidence was not erroneous; the only deficiency was the trial court's reason for a correct action.  But if the admission or use of the evidence had no valid justification at all, then it is truly erroneous, and the error may find no safe harbor under the right-for-any-reason doctrine.

The Majority rejects Hamlett's framework, opining that "the selection of an incorrect basis for admitting evidence can be viewed as employment of an erroneous rationale," and, thus, that Hamlett's categories are "not mutually exclusive."  Maj. Op. at 11. Rejecting Hamlett's lexicon, however, does not result inexorably in a functional equivalence between the harmless error and right-for-any-reason doctrines.  I find that Hamlett's classification scheme presents a useful exercise, but it merely places a label

upon elementary right-for-any-reason principles. It is not necessary to the analysis, because differences between the doctrines abound.

Of course, an immediate and dispositive distinction is that the harmless error doctrine always has imposed a burden upon the prosecution, while the right-for-any-reason doctrine places no parallel burden upon the party seeking its benefit. But that is not even the most obvious difference. As evidenced by their very names, the doctrines pose different questions to the court. When an appellate court applies the *right*-for-any-reason doctrine, it ultimately finds no reversible error, because the challenged decision was "right," for a different reason than was articulated below. The right-for-any-reason doctrine asks the question: "Was the challenged action erroneous?" Harmless *error*, by contrast, is a question of effect—once an error has been found, harmless error doctrine asks the question: "Did the error change the outcome?"

The right-for-any-reason doctrine is best conceptualized as allowing for the identification of an alternative, valid, legal justification for a challenged action. "We have often stated that where a court makes *a correct ruling*, order, decision, judgment or decree, but assigns an erroneous reason for its action, an appellate court will affirm the action of the court below and assign the proper reason therefor." *Bearoff,* 327 A.2d at 76 (emphasis added; capitalization modified). It is self-evident that an "error" is not a "correct ruling" suitable for disposition under the right-for-any-reason doctrine. Rather, an error is an error, suitable for analysis under the harmless error doctrine.

An archetypal example of the right-for-any-reason precept occurs when the trial court offers a flawed rationale for its decision to admit a challenged piece of evidence, but the facts nonetheless support the admission of that evidence for a different reason or pursuant to a different rule. To perform the right-for-any-reason analysis in such a case, the appellate court merely must assess whether the established evidence of record

satisfies an existing legal rule—a familiar task for appellate courts. If the facts fit the rule, then we may conclude that the challenged action was proper, not erroneous. *See, e.g.*, *In re A.J.R.-H.*, 188 A.3d 1157, 1176 (Pa. 2018) ("The [right-for-any-reason] doctrine thus may be applied by a reviewing court if the established facts support a legal conclusion producing the same outcome."). If such is an error, it is an error only in form, not in substance. *See Thomas v. Mann*, 28 Pa. 520, 522 (Pa. 1857) ("The only error upon the record is a wrong reason for a right judgment; but, as we review not reasons but judgments, we find nothing here to correct."). With harmless error, by contrast, there *is* something to correct. There is a legal error that may have impacted the outcome.

The right-for-any-reason doctrine does not require the appellate court to consider the *effect* of an error on the totality of the proceedings. The analysis does not require a speculative inquiry into the likely impact upon a juror of hearing erroneously admitted evidence, or an examination of whether the evidence may have strengthened certain arguments in the eyes of a juror or called others into question, or—ultimately—a determination that the jury still would have returned a guilty verdict absent the evidence. These latter inquiries are hallmarks of the challenges underlying harmless error. Where the right-for-any-reason doctrine is concerned with legal justifications, harmless error is essentially more of a factual judgment than a legal one—whether, under the facts and circumstances presented, beyond a reasonable doubt, a jury would have returned the same verdict regardless of the error.

Answering the harmlessness question, moreover, poses intractable difficulties stemming from the inherent limitations of appellate review. Quoting California Chief Justice Roger Traynor's famous treatise on harmless error, this Court in *Story* observed:

> The appellate court is limited to the mute record made below. Many factors may affect the probative value of testimony, such as age . . . intelligence, experience, occupation, demeanor, or temperament of the witness. A trial court or jury before whom witnesses appear is at least in a position to take

note of such factors. An appellate court has no way of doing so. It cannot know whether a witness answered some questions forthrightly but evaded others. It may find an answer convincing and truthful in written form that may have sounded unreliable at the time it was given. A wellphrased sentence in the record may have seemed rehearsed at trial. A clumsy sentence in the record may not convey the ring of truth that attended it when the witness groped his way to its articulation. What clues are there in cold print to indicate where the truth lies? What clues are there to indicate where the half-truth lies?

*Story*, 383 A.2d at 168 (quoting ROGER J. TRAYNOR, THE RIDDLE OF HARMLESS ERROR 20-21 (1970)).

This Court has developed certain guidelines in order to make our journey into these unfamiliar waters more comfortable—such as requiring that harmlessness be predicated upon uncontradicted evidence so as to avoid the morass of appellate credibility determinations. *See Story*, 383 A.2d at 166-68. This Court also has overlooked those guidelines in our *sua sponte* pursuit of the doctrine. *See Hitcho*, 123 A.3d at 748. The truth of the matter is that harmless error analysis remains a challenging task in a significant number of cases. The endeavor is unavoidably speculative. The doctrine asks appellate judges to evaluate and assess the persuasiveness of the entirety of an evidentiary record, to run a hypothetical trial in our minds sanitized of the legal error before us, while setting aside our own suspicions as to the guilt or innocence of the accused (which may indeed be influenced by the error at issue), and to opine conclusively as to how a hypothetical jury would have viewed a hypothetical body of evidence.[9] This is

---

[9] Although such analyses pose unique difficulties on appeal, it would be an overstatement, of course, to suggest that appellate courts are wholly incapable of rendering judgments about the potential impact of certain evidence upon the fact-finder, or the ultimate likelihood that a different result would have obtained. Indeed, in modern post-*Chapman* jurisprudence, harmless-error-type inquiries have been engrafted upon a number of substantive legal rules, such as the standard for demonstrating prejudice in the ineffectiveness of counsel context, and the test for materiality under *Brady v. Maryland*, 373 U.S. 83 (1963). *See* Edwards, *supra* n.3, at 1178 (conceptualizing the development of these standards as an outgrowth of the harmless error rule). For better

palpably dissimilar from many of the purely legal considerations that might be resolved easily and fairly under the right-for-any-reason doctrine. Fortunately, although the harmlessness inquiry can be challenging, the court need not go it alone. The court can be aided greatly by the parties' advocacy, *see supra* Part II(A), and, in particular, by an effort from the Commonwealth, as the beneficiary of the error, to demonstrate that the error could not have contributed to the verdict.

The Majority may dismiss Hamlett, or me, as "impugning harmless-error review as such, as distinguished from the *sua sponte* aspect." Maj. Op. at 11 n.9. But by these observations, I mean to reveal disparities between the doctrines before us, to the extent that those disparities tend to undercut the Majority's thinly supported assertion that one doctrine may be viewed as a mere application of the other.[10] Given the specific challenge

_____

or worse, this has become a familiar exercise. A critical difference in the *Brady* and ineffectiveness areas, however, is that the burden to make the showing is placed upon the *appellant* instead of the prosecution, and this Court, at least, strictly requires the appellant to carry that burden, and will not hesitate to deem the appellant's claim waived if it lacks sufficient development. I further address concerns regarding issue-preservation, development, and waiver below. *See infra* at 25-27; 38-40.

[10] Although it favorably cites a Georgia decision, the Majority acknowledges that its approach—collapsing the harmless error rule into the right-for-any-reason doctrine and approving limitless *sua sponte* invocation of either—is not common among American jurisdictions. Maj. Op. at 9 n.6. The Majority deems all other approaches to *sua sponte* consideration of harmless error to be simply a "close cousin" of its own approach, but it does not elaborate upon this assertion. I question the degree of relation.

For its recourse to Georgia law, the Majority invokes *Jones v. State*, 802 S.E.2d 234, 237 (Ga. 2017) (admission of prior bad acts evidence "was harmless as to appellant's conviction and sentence . . . and so the Court of Appeals' judgment is affirmed as right for any reason"); *see* Maj. Op. at 9. However, the same tension that the *Mitchell* footnote has engendered in Pennsylvania appears to afflict Georgia's jurisprudence in precisely the same way. The *Jones* Court did not refer to the harmless error rule as imposing a "burden" at all, despite the Georgia Supreme Court's recognition of that burden with respect to evidentiary errors like that found in *Jones*, even in cases decided in the same year as *Jones*. *See Bozzie v. State*, 808 S.E.2d 671, 677 (Ga. 2017) ("For nonconstitutional harmless error, the State has the burden to show that it was highly probable that the error did not contribute to the verdict."). Although the Majority

before this Court—which reveals significant difficulties with the *sua sponte* aspect of the challenged jurisprudence on multiple fronts, and which suggests a simple solution—the remainder of one's opinions about the balance of the harmless error rule would seem to be of little consequence.

Perhaps some additional insight into the Majority's reasoning may be gleaned from its summary of the Commonwealth's arguments, inasmuch as the Majority "agree[s] with the Commonwealth in all material respects." Maj. Op. at 8. Accordingly, one may presume that the Majority endorses at least all of the Commonwealth's arguments that it summarizes in its Opinion. Concerning the absence of the Commonwealth's burden when the court pursues harmless error *sua sponte* under the right-for-any-reason doctrine, the Majority favorably quotes the Commonwealth's reliance upon a "core precept underlying the right-for-any-reason doctrine, which is that only *appellants* are charged with issue preservation obligations, whereas *appellees* bear none." *Id.* (citing Brief for Commonwealth at 42) (emphasis in original). Hamlett's position, the Majority and the Commonwealth fret, might "upend this conventional approach to issue preservation by imposing waiver, or its functional equivalent, on the government as appellee." *Id.* (citing Brief for Commonwealth at 7, 42).

First of all, it is curious that the Majority would deem "issue preservation obligations" to be a "core precept" of the right-for-any-reason doctrine, for it apparently does not view the prosecution's burden of persuasion to be a "core precept" of the harmless error doctrine. The prosecution's burden is indeed a "core precept" of harmless error; in fact, it is the "second general precept" underlying the doctrine. *Davis*, 305 A.2d at 719; *see supra* at 7; *see also supra* n.1. When harmless error "functions as the

establishes that we are not alone in rendering incompatible pronouncements on harmless error, nothing in *Jones* helps to reconcile the incongruity between unfettered *sua sponte* review and the recognition of a burden imposed upon a party.

underlying substantive principle of law," Maj. Op. at 9, to which the court resorts through its discretionary prerogative to employ the "right-for-any-reason precept," *id.*, what happens to the general precepts of the harmless error doctrine?  It seems that a core precept of the harmless error doctrine is jettisoned, yet what the Commonwealth simply insists is a "core precept" of the right-for-any-reason doctrine mysteriously remains.

In any event, the Commonwealth's focus upon the absence of an issue-preservation obligation upon appellees is a *non sequitur.*  Maj. Op. at 8; Brief for Commonwealth at 42, 46.  We have never suggested that the Commonwealth's burden is one of issue-preservation; the Commonwealth need not raise the issue before the trial court in the first instance on pain of waiver.  Its burden is one of persuasion, and may be satisfied by offering argument to the reviewing court for the first time on appeal.  The absence of an issue-preservation burden upon appellees, thus, is irrelevant.  The point would be roughly equivalent to suggesting that a court may research, litigate, and rule upon a claim that the *appellant* fails to assert in its brief, simply because the appellant preserved an objection and included the issue in its Pa.R.A.P. 1925(b) statement.  Issue-preservation is beside the point.

We speak of a burden of persuasion.  Even if one assumes that it would be absurd or unreasonable to impose an issue-preservation burden upon the Commonwealth as to the harmlessness question, the suggestion of the Commonwealth's "waiver" would not follow from failure to preserve an issue.  A finding of waiver is not a ludicrous response to an observation that a litigant has failed to develop *advocacy* on a question as to which it bears the burden.  Even guiding federal jurisprudence, to which the Majority adverts but does not discuss, recognizes the government's failure to advocate as precisely this sort of "waiver."  *Giovannetti*, 928 F.2d at 226; *see infra* at 38-40; *but see* Maj. Op. at 10 n.7.  The point that the Majority appears not to appreciate is that we will enforce an appellant's

"waiver" for failure to develop a claim upon which the appellant bears the burden of persuasion, but we are appreciably hesitant to impose any consequence whatsoever upon the Commonwealth's identical failure, or even to acknowledge it as such. We have hesitated so long that a "tension" with fundamental principles has arisen in our jurisprudence, which we now have been asked to confront and to resolve. *Commonwealth v. Hamlett*, 202 A.3d 45 (Pa. 2019) (*per curiam*).

After its diversion into issue-preservation concerns, the Majority next favorably quotes a set of excuses that the Commonwealth provides as to why it is onerous for it to carry its burden of persuasion—a point that strikes me less as concerning the right-for-any-reason doctrine and more as an argument in favor of overruling *Story*, but I digress. The Majority summarizes the Commonwealth's assertion that "there are many reasons why advocates representing appellees may refrain from presenting certain alternative arguments, such as out of a concern that such references might dilute the strength of primary contentions, or on account of word-count limitations on briefing." Id. (citing Brief for Commonwealth at 43, 50). The Commonwealth, and by extension the Majority, seems to question whether our courts are capable of effectively weighing a legal argument that is followed by an alternative analysis. I am not so skeptical of our appellate jurists' abilities. Able lawyers themselves, I am confident that they can identify and recognize the purpose of an alternative argument. There is no reason to believe that courts will suddenly begin to overlook meritorious legal arguments because the Commonwealth also argues, in the alternative, that the asserted error was harmless. As for word-count limitations, we do not allow such requirements to serve as an excuse for any other litigant to fail to advocate for his or her position, and they manage to do so even in highly complex cases. And, of course, if the Commonwealth fears that presenting arguments to the court will cause it to expend the 14,000 words allotted to it, it remains free to seek the court's

leave for an exception.[11]  I am further certain that our procedural rules could respond to any systemic concerns that such advocacy may present.  Pointing to word-count limitations is little more persuasive than would be an assertion that we must have due regard for circumstances in which the Commonwealth's dog eats its homework.

The right-for-any-reason and harmless error doctrines may ultimately serve similar ends—affirmance—but they are not the same doctrine.  In the Majority's conflation of them, the obligation of the Commonwealth to advocate for its position has gone missing. The Majority asserts that what it describes is an invocation of the "right-for-any-reason precept" to apply the harmless error doctrine as the "underlying substantive principle of law," Maj. Op. at 9, but I fail to understand why the "second general precept" of the harmless error doctrine, *Davis*, 305 A.2d at 719, simply disappears from the analysis. Because core precepts of these doctrines stand in clear tension with one another, perhaps the analysis is not as straightforward as the Majority suggests.

## C. Judicial Impartiality

Hamlett further contends that *sua sponte* harmlessness findings are in tension with the fundamental obligation of the judiciary to remain neutral and impartial.  He reminds us that the adversarial process, essential to the American model of criminal justice, has two central components:  "(1) neutral and passive decision makers and (2) party presentation of evidence and arguments."  Brief for Hamlett at 38 (quoting Adam A. Milani & Michael R. Smith, *Playing God:  A Critical Look at* Sua Sponte *Decisions by Appellate Courts*, 69 TENN. L. REV. 245, 272 (2002)).  Hamlett argues that the practice of raising and deciding issues *sua sponte*, harmless error in particular, stands in tension with the well-understood role of appellate courts, articulately described by then-Judge Antonin

---

[11]    Pa.R.A.P. 2135(a)(1) ("Unless otherwise ordered by an appellate court . . . a principal brief shall not exceed 14,000 words . . . .").

Scalia as bodies that "do not sit as self-directed boards of legal inquiry and research, but essentially as arbiters of legal questions presented and argued by the parties before them." *Id.* (quoting *Carducci v. Regan*, 714 F.2d 171, 177 (D.C. Cir. 1983)).[12] "Put simply," Hamlett summarizes, "where the Commonwealth fails to take an adversarial position on the matter of harmless error, it is not up to the appellate courts to pick up the slack." *Id.* at 40. The now-prevailing approach, Hamlett observes, "confers upon reviewing courts essentially unfettered discretion" in deciding whether to reverse or to pursue harmless error. *Id.* at 42. This, in turn, "imperils our jurisprudential ideals of evenhandedness, predictability, consistency in the development of legal principles, reliability on judicial decisions, and the actual and perceived integrity of the judicial process." *Id.* at 41.

The Majority rejects Hamlett's argument without substantial discussion, adverting again to principles of judicial economy and the "larger concerns" of the "social costs of retrial." Maj. Op. at 10. I believe that those latter interests are largely the responsibility of the Commonwealth to advance, if it so desires. I also find the perceived neutrality of the judiciary to be an exceptionally weighty concern. Hamlett's observations ring true in many respects. Although there are other issues that a court may raise *sua sponte* pursuant to longstanding precedent, I can conjure no other circumstance where a party has an express and established burden to prove a particular assertion, yet the court may excuse that burden, take it upon itself, and declare victory for the party who has done nothing to claim it. Earlier in this opinion, I characterized the finding of harmlessness as a "knockout blow," inasmuch as it adversely disposes of the appellant's claim of error.

---

[12] *See also McNeil v. Wisconsin*, 501 U.S. 171,181 n.2 (1991) ("What makes a system adversarial rather than inquisitorial is . . . the presence of a judge who does not (as an inquisitor does) conduct the factual and legal investigation himself, but instead decides on the basis of facts and arguments pro and con adduced by the parties.").

*Supra* at 5. But when the court finds harmlessness without being asked or without the matter being litigated, that final punch comes not from one of the boxers; it is thrown by the referee. The appellant has proven the existence of an error—the Commonwealth is on the ropes. Yet, in comes the referee with the harmlessness haymaker, and the appellant is down for the count. Certainly, no one watching that bout would characterize the referee as a passive and neutral arbiter.

At the very least, the continued absence of guidance from this Court as to when the harmlessness question may or should be raised *sua sponte*—a problem that persists through today's decision—allows for inconsistent application and potentially arbitrary results. As it stands now, different panels of our Superior Court may take wholly different approaches. One panel finding an error may observe that the words "harmless error" appear nowhere in the Commonwealth's brief, and simply reverse. Another panel may take that same appeal and same error, and proceed to a harmlessness inquiry *sua sponte*. Further, without guidance or argument from the parties, panels undertaking the inquiry *sua sponte* may emphasize different aspects of the case, or find something in the record that others might overlook on their self-guided tour, leading panels to reach very different conclusions on the question. The fault for inconsistency in the case law, however, lies not with the Superior Court. The Commonwealth is not to blame either, even though the routine absence of its advocacy is the source of many of the identified ills. The fault lies with this Court, which gradually has eroded the Commonwealth's burden, but has left our lower courts without guidelines for *sua sponte* application of the doctrine.

Concern for evenhandedness would appear to be particularly acute in this context, inasmuch as a finding of harmlessness always redounds to the benefit of the prosecution, never to the defense. Perhaps this is why a portion of the Commonwealth's argument

endorsed by the Majority can glibly suggest that, "[s]urely, the appellate courts of this Commonwealth do not take lightly their duty to make fair and just decisions when the lives and liberty of criminal defendants are at stake." Maj. Op. at 8 (quoting Brief for Commonwealth at 27). Naturally the Commonwealth is not particularly concerned; it stands to lose very little from deficient findings of harmless error. I believe that Hamlett has identified, and I have discussed, cases in which even this Court has given questions of harmless error less than the full consideration that they may have deserved. The fact that the Commonwealth can provide a list of cases that it deems to contain "good" uses of *sua sponte* harmless error review, *id.* (citing Brief for Commonwealth at 27 n.2), does not remove the potential for arbitrariness and abuse that inheres in the practice. It is facially suspect that a court is empowered to intervene on behalf of, and to assume the role of an advocate for, one party but not the other. This may be regarded as a question of appearance, regardless of whether the resolution of any particular case is driven by unseemly motivations. *Cf. In Interest of McFall*, 617 A.2d 707, 711 (Pa. 1992) ("We hold herein that the impartiality of the court, which is a fundamental prerequisite of a fair trial, must be deemed compromised by appearance alone, thus eliminating the need for establishing actual prejudice."). A truly impartial arbiter requires each party to carry its own burden.

### D. Due Process

The Majority rejects Hamlett's due process argument in one paragraph, with two indirect responses. Hamlett develops an intriguing claim. He begins with the most fundamental command of due process: "that deprivation of life, liberty or property by adjudication be preceded by notice and opportunity for hearing appropriate to the nature of the case." Brief for Hamlett at 30 (quoting *Mullane v. Cent. Hanover Bank & Trust Co.*, 339 U.S. 306, 313 (1950)). The critical right to be heard "has little reality or worth unless

one is informed that the matter is pending and can choose for himself whether to appear or default, acquiesce or contest." *Id.* at 31 (quoting *Mullane*, 339 U.S. at 314).  When an appellate court performs a harmless error analysis *sua sponte*, after the parties have filed their briefs, without informing them that the issue will be dispositive of the appeal, and without providing the appellant with an opportunity to argue against the finding, the appellate court deprives the appellant of due process.  Moreover, such a circumstance deprives the appellant of the opportunity to be heard *by counsel*, in further tension with due process norms.  *Id.* at 33-35.  Hamlett reminds us that the "right to be heard would be, in many cases, of little avail if it did not comprehend the right to be heard by counsel." *Id.* at 34 (quoting *Powell v. Alabama*, 287 U.S. 45, 68-69 (1932)).

Notably, unlike the United States Constitution, the Pennsylvania Constitution expressly guarantees the right to appeal.[13]  Accordingly, in this Commonwealth, a convicted defendant has an express right to appeal his judgment of sentence, and has a right to due process, which, at a minimum, contemplates notice and an opportunity to be heard before the disposition of a matter in which his life or liberty is at stake.  At least in this context,[14] merely combining a few fundamental propositions of law reveals that Hamlett's suggestion is compelling.

---

[13]  *See* PA. CONST. art. V, § 9 ("There shall be a right of appeal in all cases to a court of record from a court not of record; and there shall also be a right of appeal from a court of record or from an administrative agency to a court of record or to an appellate court, the selection of such court to be as provided by law; and there shall be such other rights of appeal as may be provided by law.").

[14]  The suggestion that *sua sponte* decision-making may raise due process concerns is not unheard of in Pennsylvania law, nor in broader legal scholarship.  *See Fallaro v. Yeager*, 528 A.2d 222, 224 (Pa. Super. 1987) ("Due process requires that the litigants receive notice of the issues before the court and an opportunity to present their case in relation to those issues. It is even more e[g]regious an error when the lack of notice, through variance from the pleadings, is the court's doing.  For when the issue is first stated only in the court's resolution of it, the unsuspecting party has no opportunity during the proceedings to voice his objections or match his case to the altered issue.") (quoting *In*

The Majority gives two reasons for rejecting Hamlett's position, neither of which responds directly to Hamlett's constitutional grievance. First, the Majority concludes that *sua sponte* consideration of harmless error does not deprive an appellant of due process because, if this were the case, then the federal statute and rule that provide for harmless error review would be "patently unconstitutional as applied to their authorization of harmless-error review by the federal appellate courts acting of their own accord." Maj. Op. at 10-11. Although this is a worthy matter to ponder, it is ultimately beside the point, for the constitutionality of federal practice is not the question here, and, in any event, the right to appeal is not enshrined in the federal Constitution, as it is in ours. *Supra* n.13. Regardless, as the Majority seems to acknowledge, recognizing a due process component of the procedure by which harmlessness is determined would not necessarily render the federal enactments facially unconstitutional, inasmuch as the Majority refers to as-applied challenges. Perhaps unbounded discretion to resort to harmless error *sua sponte* is also problematic in federal court. *See infra* Part III. We are not called upon to so decide; it is Pennsylvania law that is before us today. Because the Majority's observation does not substantively respond to Hamlett's contention regarding the contravention of due process norms, I am uncertain as to why it should dispose of anything here.

The Majority provides one additional reason to dispense with Hamlett's due process argument. The Majority states: "In cases in which harmlessness may be a

*Interest of M.B.*, 514 A.2d 599, 601 (Pa. Super. 1986), *aff'd*, 538 A.2d 495 (Pa. 1988)); *see generally* Barry A. Miller, Sua Sponte *Appellate Rulings: When Courts Deprive Litigants of an Opportunity to Be Heard*, 39 S.D. L. Rᴇᴠ. 1253 (2002).

Hamlett's invocation of due process also is echoed by the only *amicus curiae* participating in this appeal. *See* Brief for *Amicus Curiae* Pennsylvania Association of Criminal Defense Lawyers at 4-12 (arguing that *sua sponte* findings of harmless error deprive the appellant of the right to counsel and the due process right to notice and an opportunity to be heard).

factor . . . able defense attorneys can well anticipate that appellate courts may be legitimately concerned with the societal costs attending a new trial, and those attorneys are free to address the prejudicial impact of trial errors in their own appellate briefs." Maj. Op. at 11. This point likewise fails to respond directly to Hamlett's grievance, but it is also highly problematic for at least three additional reasons.

First, this is nothing more than improper burden-shifting. The Majority seems to be giving standing instructions to defense attorneys that, if they wish to represent their clients "ably," perhaps *effectively*, they had better argue against harmlessness as a matter of course, lest the Commonwealth fail to meet its burden and the appellate court choose to tag itself in. This strikes me as no different than inverting the Commonwealth's burden and placing it upon defense counsel. The Majority cautions against the right-for-any-reason doctrine imposing a "high barrier to reversal," *id.* at 11, but it imposes ever more hurdles to relief. Where once the Commonwealth had a burden to establish harmless error, now the Majority expects "able" defense counsel to anticipate that the Commonwealth will fail to advocate for its position, and it instructs defense counsel, on counsel's own initiative, to expend additional resources to rebut an argument that has not yet been made, as to which the Commonwealth nominally has the burden of persuasion and the defense accordingly should stand in a responsive posture, so as to persuade the court that the substantive legal error, which defense counsel will have just proven on the merits, is worthy of relief—all of this depending, of course, upon whether the court employs its discretion to consider harmless error at all. The Majority instructs defense attorneys not only to satisfy their own burdens to prove legal error, but also to rebut, in advance, the argument that the Commonwealth might or might not choose to make, and that the court might or might not choose to undertake. The Majority not only shuffles the responsibility for the doctrine over to defense counsel, it asks defense counsel to go first.

Without knowing what the Commonwealth would argue, or if it will argue, counsel filing the principal brief for the appellant can offer only speculative defenses to hypothetical arguments about harmless error.

Is the Commonwealth not an "able" advocate for its own position?

Second, the Majority's comment on the duties of able defense counsel arises in the context of a due process claim regarding the deprivation of notice and an opportunity to be heard on a critical matter. To my knowledge, due process jurisprudence has never placed the onus upon the individual subject to the deprivation to anticipate such deprivation and launch a prophylactic challenge thereto. To the contrary, it is inherent in the concept of "notice" that the individual is to be *provided* with notice of adverse action; he is not expected to divine and preempt it. *See, e.g.*, *Mullane*, 339 U.S. at 314 ("An elementary and fundamental requirement of due process in any proceeding which is to be accorded finality is notice reasonably calculated, under all the circumstances, *to apprise interested parties* of the pendency of the action and afford them an opportunity to present their objections.") (emphasis added).

Third, the Majority's suggestion to able defense counsel overlooks our own precedent. In the *Mitchell* footnote, itself—the beginning of this line of cases that has usurped *Story*—this Court used an able defense attorney's proactive advocacy as a substitute for the Commonwealth's burden, and went so far as to suggest that our consideration of harmless error therefore was not even an action taken *sua sponte*. *See Mitchell*, 839 A.2d at 215 n.11; *supra* at 8. We then overlooked the Commonwealth's dereliction, and ruled against the appellant. Today's Majority does not suggest its disapproval of the *Mitchell* footnote, and indeed it directly embraces the legal approach that *Mitchell* pioneered, or clumsily engrafted upon our case law. Against the backdrop of the precedent challenged in the very case before us, the Majority's suggestion that able

defense counsel should anticipate and argue against harmless error strikes me as a cruel sort of irony.

The Majority speaks of what it deems to be the current state of Pennsylvania law, and lauds its "due and appropriate regard for defendants' substantive rights." Maj. Op. at 6-7. I see due and appropriate regard in *Story*. I do not find it in the *Mitchell* footnote, or in *Hitcho*. I see a credible assertion of a substantive constitutional right in this case, which the Majority dodges with arguments that do not respond to the deprivation that both Hamlett and *amicus* have identified and placed squarely within this Court's view. I do not doubt that the law on this question can reflect a better balance between "the promotion of judicial economy" and the "due and appropriate regard for defendants' substantive rights." Maj. Op. at 7. The law can require the Commonwealth to advocate for the Commonwealth's position, can demand that the defense be given notice and an opportunity to respond, and can tell the court to simply adjudicate rather than attempt to play judge, prosecutor, and defense counsel all at once.

Harmless error is often the line between a new trial and many years in prison. Where the stakes are such, it is only fair to provide the interested party with notice that the issue is under consideration, and with an opportunity to speak on the matter through counsel. Regardless of whether the deprivation of that notice and opportunity constitutes a due process violation, it certainly is less than a completely fair practice. The Majority seems to recognize as much, at least by implication. *See* Maj. Op. at 12 (suggesting that a court considering harmlessness *sua sponte* in "close cases" may order supplemental briefing in order to "enhance fairness to the defendant"). Every defendant should be entitled to fairness; fairness should not need to be "enhanced" in any particular case. The way to encourage evenhanded treatment is to set a consistent standard and then apply it rigorously. Due process or not, that is simply a matter of good judicial practice.

**III.**

All participants here—the parties, the Majority, the Concurrence, and myself—have made some references to federal harmless error practice. Both the Majority and the Concurrence refer to the standard for *sua sponte* consideration of harmless error outlined in the Seventh Circuit's oft-cited, *per curiam* decision in *Giovannetti*, 928 F.2d 225, though they do not discuss its details. *See* Maj. Op. at 12 n.10; Conc. Op. at 2 (Donohue, J.). *Giovannetti* also appears in the advocacy of the parties. Accordingly, it is worth considering the legal analysis to which the parties, the Majority, and the Concurrence all refer, alongside a recognition of the ways in which Pennsylvania jurisprudence differs from its federal counterpart on matters of harmless error.

Federal criminal law provides for harmless error analysis by statute and rule, neither of which have a corollary in Pennsylvania criminal law. Both the federal statute and rule direct a reviewing court, in mandatory language, to disregard any error that does not affect the "substantial rights" of a party. Brief for Hamlett at 26-27 & nn. 17-18 (quoting Fed.R.Crim.P. 52(a) ("Any error, defect, irregularity, or variance that does not affect substantial rights must be disregarded."); 28 U.S.C. § 2111 ("On the hearing of any appeal . . . the court shall give judgment after an examination of the record without regard to errors or defects which do not affect the substantial rights of the parties.")). Hamlett is quick to point out that Pennsylvania has no such statute, and although similar "substantial rights" provisions appear elsewhere in our procedural rules, there is no such language in our Rules of Criminal or Appellate Procedure. *Id.* at 28. Harmless error is judge-made law in Pennsylvania.

Also noteworthy, in my view, is that the Supreme Court of the United States has described the harmless error inquiry under the Federal Rules of Criminal Procedure as the inverse of the appellant's burden to prove *plain error*. *See United States v. Olano*,

507 U.S. 725, 734 (1993) ("When the defendant has made a timely objection to an error and Rule 52(a) [(harmless error)] applies, a court of appeals normally engages in a specific analysis of the district court record—a so-called 'harmless error' inquiry—to determine whether the error was prejudicial. Rule 52(b) [(plain error)] normally requires the same kind of inquiry, with one important difference: It is the defendant rather than the Government who bears the burden of persuasion with respect to prejudice."). Unlike the federal judiciary, this Court does not recognize the plain error doctrine; rather, we strictly adhere to a paradigm of issue-preservation and waiver. *See generally* Pa.R.A.P. 302. In this way, federal jurisprudence reflects a symmetry wholly lacking in Pennsylvania law.

Earlier I quoted the Seventh Circuit's *per curiam* decision in *Giovannetti* for its observation that conducting a harmless error analysis *sua sponte* "would place a heavy burden on the reviewing court." *Giovannetti*, 928 F.2d at 226; *supra* at 17. The court discussed this labor while rejecting the government's primary argument: that the government's harmless error arguments, themselves, are "nonwaivable." *Id.* at 226. The court rejected the government's contention that the mandatory language of Fed.R.Crim.P. 52(a)—errors which do "not affect substantial rights shall be disregarded"—meant "that even if the government does not argue harmless error, we must search the record—without any help from the parties—to determine that the errors we find are prejudicial, before we can reverse." *Id.* The court was troubled by the burdens that would fall to the court instead of the government, and cautioned against the "salami tactics" that the government could use to hedge against having to argue the issue at all. *Id.* "Such tactics would be particularly questionable in a case such as this," the court emphasized, "where the defendant goes out of his way to argue that the error of which he complains was prejudicial, and the government by not responding signals its acquiescence that if there was error, it indeed was prejudicial." *Id.* *But see Mitchell*, 839 A.2d at 215 n.11.

This satisfied the *Giovannetti* court that "harmless-error arguments can be waived." *Giovannetti*, 928 F.2d at 226.[15] It was a "separate question" whether the government's waiver "always binds the court." *Id.* Thus, looking elsewhere in the federal rules, and finding a general rule of construction in favor of simplicity, fairness, and the elimination of unjustifiable expense, the *Giovannetti* court concluded that its powers were discretionary; that courts "are not required to scour a lengthy record on our own, with no guidance from the parties," but that they may deem themselves "authorized, for the sake of protecting third-party interests including such systemic interests as the avoidance of unnecessary court delay, to disregard a harmless error even though through some regrettable oversight harmlessness is not argued to us." *Id.*

Despite its deep reservations about *sua sponte* use of the harmless error doctrine, and despite its refusal to excuse the government's waiver in the very case before it, the *Giovannetti* court nonetheless developed a multifactorial test pursuant to which a court may "overlook" the government's waiver and proceed *sua sponte. Id.* at 227. The "controlling considerations," the court explained, are: (1) "the length and complexity of the record"; (2) "whether the harmlessness of the error or errors found is certain or debatable"; and (3) "whether a reversal will result in protracted, costly, and ultimately futile proceedings in the district court." *Id.* Applying that standard, the *Giovannetti* court ultimately concluded that the case before it did not warrant *sua sponte* consideration of harmless error, and it accordingly "decline[d] to relieve the government from the consequences of its failure to raise the issue of harmless error in its brief on appeal." *Id.*

---

[15] *But see* Maj. Op. at 8 (agreeing with the "the Commonwealth's view" that Hamlett "seeks a novel decisional rule that would necessarily upend this conventional approach to issue preservation by imposing waiver, or its functional equivalent, on the government as appellee").

The federal intermediate courts widely have adopted some version of the *Giovannetti* test, but the Supreme Court has never endorsed its rubric. *See, e.g., United States v. Gonzales-Flores*, 418 F.3d 1093, 1099-1101 (9th Cir. 2005); *United States v. Rose*, 104 F.3d 1408, 1414-15 (1st Cir. 1997); *United States v. Pryce*, 938 F.2d 1343, 1347-48 (D.C. Cir. 1991) (plurality). I do not find the test persuasive. Even if all of its factors counsel in favor of *sua sponte* review, it nonetheless suffers from the same fundamental deficiency as the Majority's analysis herein—it allows the court to excuse and then assume a litigant's burden of persuasion. Furthermore, the *Giovannetti* test is not harmonious with our general approach to waiver in Pennsylvania. Although the Majority summarily states that *Giovannetti*'s discretionary approach "is also the case in the Pennsylvania state courts," Maj. Op. at 10 n.7, we do not generally instruct our courts to "overlook" a party's waiver. Pennsylvania law treats waiver most strictly. Moreover, there is a degree of internal tension within the *Giovannetti* test, inasmuch as avoiding a "protracted" and "costly" retrial would appear to cut in favor of *sua sponte* review, but such a retrial likely would be protracted and costly precisely because of the "length" and "complexity" of the record—a factor that *Giovannetti* suggests would militate against *sua sponte* review. Conversely, a short and simple record seemingly would suggest that *sua sponte* review is more manageable, but for precisely that reason, a retrial would be relatively less burdensome and costly, thus counseling against *sua sponte* review.

Regardless, the third *Giovannetti* factor—avoidance of "costly" but "ultimately futile" retrials—is merely a reference to the concerns with judicial economy that undergird the whole doctrine, not a helpful or case-specific consideration. The Majority refers in passing to the second *Giovannetti* factor, which I take to be the essence of the test: that the court should be "certain" that the error is harmless, and should not conduct the inquiry if it is "debatable." *Giovannetti*, 928 F.2d at 227. It remains mysterious to me how one

could purport to be certain that an error was harmless in the course of "deciding whether to exercise [the court's] discretion" to consider the doctrine *sua sponte* in the first place. *Id.* One seemingly must be certain of an error's harmlessness before even considering the harmless error doctrine. The Majority suggests that the requirement of "certainty" is a "more discerning review" than the court might apply if it was not proceeding *sua sponte*. Maj. Op. at 12 n.10. I fail to see how elevating the standard to "certainty" is meaningfully different than applying the beyond-a-reasonable-doubt standard that ordinarily governs the inquiry. *See supra* Part I. We will never be "certain" of what twelve jurors would have done if the trial had been different. The ordinary beyond-a-reasonable-doubt review is essentially as "discerning" a standard as the law can provide. To demand the court's assertion of "certainty" means only that the court must utter a magic word before it proceeds to do precisely what it would have done otherwise.

Contrary to what may be the tacit suggestion of either the Majority or the Concurrence, or both, the *Giovannetti* test is not fit for this inquiry. A notable feature of many decisions applying *Giovannetti* or inquiries like it in other jurisdictions is some measure of caution in the approach, and some recognition of the potential downsides of *sua sponte* review. *See, e.g.*, *Gonzales-Flores*, 418 F.3d at 1101 ("[W]e are particularly sensitive to the . . . concerns that *sua sponte* consideration of harmlessness will often burden reviewing courts and give the government too many chances to argue harmless error. Even more troubling, the practice may unfairly tilt the scales of justice by authorizing courts to construct the government's best arguments for it without providing the defendant with a chance to respond. . . . We therefore conclude that *sua sponte* recognition of an error's harmlessness is appropriate *only* where the harmlessness of the error is not reasonably debatable.") (emphasis in original); *People v. Sandoval*, 363 P.3d 41, 78 (Cal. 2015) ("Courts in other jurisdictions have warned of 'the dangers of allowing

*sua sponte* consideration of harmlessness,' including 'the potential burden on reviewing courts of searching the record without guidance from the parties and encouragement of sloppy practice by lawyers.'") (quoting *Gover v. Perry*, 698 F.3d 295, 300 (6th Cir. 2012)). Indeed, in *Story*, this Court similarly urged care and circumspection in the application of harmless error analysis, albeit in response to a different set of concerns underlying the doctrine. *See Story*, 383 A.2d at 164 ("[C]ourts must be careful in applying the harmless error rule, for if the violation of a rule is too readily held harmless, the importance and effectiveness of the rule is denigrated.").

The Majority attempts to echo some of this caution, noting that many federal courts generally find *sua sponte* harmless error review to be "extraordinary" and that it "should be disfavored." Maj. Op. at 12.[16] The Majority urges that its approach "not be routinely or liberally employed to impose a high barrier to reversal of criminal convictions." *Id.* at 11. However, the Majority sets no meaningful standard, and it proposes no guardrails to ameliorate the worst of the dangers of its holding. The Majority does not even attempt to set forth any specific considerations along the lines of the *Giovannetti* test, flawed though that test may be. The Majority seemingly has left us with among the most amorphous of rules in the nation, leading the Concurrence to note the Majority's reference to *Giovannetti*, and to ponder a "question left unanswered" by the Majority. Conc. Op. at 2 (Donohue, J.). The question that the Concurrence believes the Majority has left unanswered is not an insignificant one: "What is the relevant test for determining whether an error affected the outcome when harmless error is invoked *sua sponte*?" *Id.* I wish to

---

[16] Given the Majority's recognition of the comments of federal courts as a general admonition that the practice is extraordinary and should be disfavored, Maj. Op. at 12, the Majority's observation that federal courts are not "necessarily required to invoke harmless-error precepts *sua sponte*," *id.* at 10 n.7, is something of an understatement.

know the answer to this question as well.  Unlike the Concurrence, however, the absence of an answer to that question precludes me from supporting the Majority Opinion.

**IV.**

The Majority does not speak to the facts, and alludes only generally to the substance of the Superior Court's *sua sponte* application of the harmless error doctrine in this case.  *See supra* n.2; Maj. Op. at 1-2, 3 n.2.  Although the Majority considers the substance of the case before us to be outside the scope of the question presented, its approval of *sua sponte* review for harmless error suggests that we may consider the matter irrespective of the parties' advocacy.  I do not feel it improper, then, to exercise my discretion to consider the very finding of harmless error that precipitated the instant appeal.  But we need not dwell on the matter, for only a small amount of additional detail reveals significant problems.

The Majority relates that the Superior Court found error in the admission into evidence of a video-recorded forensic interview with the victim of the alleged sexual assault, but the Superior Court deemed the error harmless, *sua sponte*, because it found the video to be merely cumulative of properly-admitted evidence in the form of the victim's testimony.  Maj. Op. at 1-2.  To reach that point, however, the Superior Court undertook a thorough analysis of Pa.R.E. 613[17] and related case law, and it found error in the

---

[17]     Rule 613 provides, in relevant part:

> **(c) Witness's Prior Consistent Statement to Rehabilitate.**  Evidence of a witness's prior consistent statement is admissible to rehabilitate the witness's credibility if the opposing party is given an opportunity to cross-examine the witness about the statement and the statement is offered to rebut an express or implied charge of:
>
> (1) fabrication, bias, improper influence or motive, or faulty memory and the statement was made before that which has been charged existed or arose; or

admission of the video because it contained a *prior consistent statement* offered merely for the impermissible purpose of corroboration, and not to rehabilitate the credibility of a witness who had been impeached. *Hamlett*, slip op. at 18-27, 2018 WL 4327391, at *8-12. But when the court turned to harmless error, *sua sponte*, it held that the error was harmless because the prior consistent statement was merely cumulative of the victim's testimony—the very testimony that it improperly sought to corroborate. *Id.* at 27-30, 2018 WL 4327391, at *12-14. How can an error be dismissed as merely cumulative, and thus harmless, when its cumulative nature was the very reason that it was error? The Superior Court stated that the same testimony that rendered the admission of the video erroneous also simultaneously made the error of its admission harmless. Surely that cannot suffice to allow an appellate court to conclude, beyond a reasonable doubt, that the absence of the error—video corroboration of critical testimony—would not have influenced the jury's assessment of the credibility of competing evidence.

The court further noted that Hamlett testified in his own defense, and it did not purport to base its conclusion upon overwhelming and *uncontradicted* evidence of Hamlett's guilt, but rather upon the "merely cumulative" variety of harmless error. Yet, the court saw fit to predict the manner in which the jury would have viewed the credibility of competing testimony, but for the error. Hamlett understandably asserted that the impermissible corroboration of the victim's in-court testimony may have prejudiced him in the eyes of the jury, inasmuch as the video could tend to bolster the credibility of the victim's in-court testimony. The Superior Court disagreed:

---

> (2) having made a prior inconsistent statement, which the witness has denied or explained, and the consistent statement supports the witness's denial or explanation.

Pa.R.E. 613(c).

> The jur[ors] heard from [the victim] under oath and their fundamental task was to weigh the credibility of her story against that of [Hamlett], who testified in his own defense. While we agree that our evidentiary rules prefer to avoid prior consistent statements, as set forth at length *supra*, we do not believe that the jury would be unduly swayed by the knowledge [the victim] previously related the same story. Indeed, the jury presumptively assumed that was the case. Thus, while there was no need to buttress her testimony, the recorded statement was merely cumulative and harmless beyond a reasonable doubt. [Hamlett] is therefore not entitled to a new trial despite the error.

*Hamlett*, slip op. at 30, 2018 WL 4327391, at *14 (citation omitted).

This was not a sufficient application of any of the harmless error standards discussed in *Story*. *See supra* n.6. The analysis of the cumulative nature of the evidence was nonresponsive to the nature of the error, and the evidence that otherwise might have been deemed "overwhelming" was expressly contradicted. It requires an appellate credibility determination to say that an error such as this was harmless. To do so, the appellate court must step into the juror box. The "superficiality" that the Majority rightly criticizes is present in the very case before us. Maj. Op. at 12. Here, the "right-for-any-reason doctrine" was indeed "routinely" and "liberally" employed to "impose a high barrier to reversal" of a criminal conviction. *Id.* at 11. Hamlett merely points to ills in our jurisprudence that appear plainly in the pages before us, which continue to echo the flaws in cases like *Mitchell* and *Hitcho*.

Future courts and litigants will research this question, they will find our decision today, and they will rely upon it. Particularly given this Court's admonition that "decisions are to be read against their facts," *Maloney v. Valley Med. Facilities, Inc.*, 984 A.2d 478, 489 (Pa. 2009),[18] I can only presume that many of those courts and litigants will consult

---

[18] *See also Tincher v. Omega Flex, Inc.*, 104 A.3d 328, 378 (Pa. 2014) ("This case speaks volumes to the necessity of reading legal rules—especially broad rules—against their facts and the corollary that judicial pronouncements should employ due modesty.") (citing *Maloney*, 984 A.2d at 489-90).

the facts of this case and the lower court decision that we affirm, as they struggle to determine how to apply the law that the Majority expounds today.  When they do, they will find a self-contradictory harmless error analysis, which weighs the credibility of contradicted evidence, which eschews the safeguards designed precisely to avoid the defects from which it suffers, and by which this Court apparently is not troubled.  They will see this Court's approval and perpetuation of an oxymoronic statement of the law:  that the "harmless error doctrine places the burden on the Commonwealth to prove beyond a reasonable doubt that the error could not have contributed to the verdict," but that simultaneously, "our jurisprudence does not require the Commonwealth to raise the matter" at all.  *Hamlett*, slip op. at 27, 2018 WL 4327391, at *12.  Litigants and courts alike now will offer *pro forma* quotations from today's Majority Opinion in their briefs and opinions, stating that the Commonwealth's burden to establish harmless error is the "ordinary rule," Maj. Op. at 9, before moving immediately to the "exception," *i.e.*, the court's unbounded discretion to ignore the ordinary rule in "appropriate" cases.  *Id.*  My impression would be that the Commonwealth's burden is gone in all but name, and that this Court does not plan to police the use of the harmless error doctrine any longer.

## V.

Our harmless error jurisprudence has gone astray because we have eroded one of its foundations.  We have before us the opportunity to rein in the worst of its potential for misuse.  The problems are apparent in our own precedent and in the very case before us.  The Majority sees at least some of these problems, and it criticizes the "superficiality" with which harmlessness is commonly discerned.  Maj. Op. at 12.  But today the Majority declines the opportunity to do anything about it.

Instead, the Majority places all of these weighty considerations within the sole discretion of the appellate court, but it offers no test, no set of factors, no interests to

balance. Indeed, the Majority's analysis barely acknowledges that a burden exists, or existed, at all. Its substantive discussion mentions the Commonwealth's burden once, which it characterizes as the "ordinary rule" to which discretionary *sua sponte* invocation of harmless error serves as an "exception" to be used "in appropriate cases." *Id.* at 9. The Majority cautions the Commonwealth that it "proceeds at its own risk," *id.* at 11 n.8, when it declines to satisfy its burden, but the Majority does not meaningfully discuss the consequence that might befall the Commonwealth should the court choose not to come to its aid, nor does the Majority provide guidance as to when a court should decide that the Commonwealth's "risk" should become a loss. As far as I can tell from the Majority's holding, the appellate court may overlook the Commonwealth's burden whenever it wants. That is not a "burden" upon a litigant to establish harmless error. It is a suggestion, at best; it is an invitation for arbitrariness in adjudication at worst. Our courts need and deserve more guidance.

To that end, I reiterate that the most straightforward solution is simply to resuscitate and then enforce the Commonwealth's burden of persuasion on appeal. The Commonwealth's principal brief is the best place to carry its burden, thereby allowing the appellant to address the Commonwealth's argument in a reply brief in the ordinary course.

The Commonwealth is the best and most able advocate for its own position, particularly as it concerns a highly record-intensive inquiry such as harmless error. Our appellate courts are busy, and I see no compelling reason why the Commonwealth's work should ever fall to the court, for that does not advance judicial economy. Thus, should the Commonwealth fail to advance a harmless error argument, or should it be expected to fail so regularly as to require us to place a safety valve in our jurisprudence, I view a focused briefing procedure to be the only possible solution that would achieve a more fair balance of harms, relative to the alternative of standardless exercises in *sua sponte*

decision-making.[19]  Generally speaking, some type of briefing procedure tailored to the harmlessness question could:  (1) preserve the Commonwealth's burden of persuasion; (2) relieve the court of the weighty and ill-defined question of when it should take up the matter *sua sponte*, mitigating the potential for arbitrariness and abuse along with it; and (3) provide the appellant with notice and an opportunity to respond, thus going a long way toward resolving the problems identified in this appeal.  Whatever our approach, however, it should be applied uniformly and consistently between cases, not in an *ad hoc* manner that depends upon whether the court deems it "appropriate" to "enhance fairness to the defendant" in a given case.  Maj. Op. at 12.

A supplemental briefing procedure also would have clear downsides, in that it would result in quite a bit of additional delay for appellants, who often are incarcerated and eagerly awaiting resolution of their appeals.  A significant increase in the volume of briefs filed also surely would place an additional administrative burden upon our prothonotaries.  Accordingly, the Commonwealth's principal brief remains the best place for the argument, and the court should not have to invite the Commonwealth to carry its burden.  To the extent that our courts lack the will to enforce the Commonwealth's burden with the threat of reversal, however, I would not exclude the possibility that certain deficiencies in our practice perhaps could be mitigated by a nuanced and informed rulemaking process.  The Court need only find the will to try.

I would insist upon a clear and predictable standard that calls for adversarial presentation of argument to the court.  Such a standard would require the party with the burden to develop the issue, provide the party with the rights with an opportunity to

---

[19]    Notably, the Commonwealth presently advocates, in the alternative, for a supplemental briefing procedure.    Brief for Commonwealth at 54-56.    The Commonwealth's alternative argument has not distracted me from analyzing the asserted merits of its primary legal contentions.  *See supra* at 27; Maj. Op. at 8 (citing Brief for Commonwealth at 43, 50).

respond, and call upon the court to neutrally decide which side has the better of it. That way, the court would not bear the weight of deciding whether to take all of these responsibilities upon itself, and it could then decide the fate of cases based upon advocacy, rather than judicial intuition or navel-gazing.

Because the Majority has a very different vision and arrives at a markedly different conclusion, I respectfully dissent.